# Richmond

## Austin T. Quick v. Southern Churchman Company, Inc.

November 21, 1938.

Record No. 1974.

Present, All the Justices.

404

The opinion states the case.

*P. A. L. Smith, Jr.,* and *M. J. Fulton,* for the appellant.

*Ralph T. Catterall,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This case was originally instituted by Austin T. Quick by notice of motion for judgment, an action at law, against the Southern Churchman, Inc., to recover damages in the sum of $10,000 for an alleged breach of contract.

The parties will be hereinafter referred to as plaintiff and defendant, the respective positions they occupied in the trial court.

The defendant filed a special plea of set-off, claiming that the plaintiff was indebted to it for money advanced in excess of the amount called for by the contract. It also filed a plea of non-assumpsit and a demurrer. The demurrer was sustained, leave being given to amend the notice of motion. An amended notice of motion was thereupon filed, as well as a bill of particulars.

Issue was joined upon the amended notice of motion, and on January 7, 1937, a jury was empaneled and sworn to try the issues. The trial court, after hearing the opening statements of counsel before the jury, and considering the facts relied on, of its own motion discharged the jury from consideration of the case, and entered an order transferring all matters in controversy to the equity side of the court. The order, to the above effect, recited that the trial court considered the cause a matter of chancery and not of law.

The record at this point shows no objection to the action of the judge, nor any exception filed thereto.

Thereafter, on January 25, 1937, the plaintiff filed a paper entitled "A Bill in Equity." The opening clause in this pleading recited that the plaintiff "duly objected" to the order of the trial court transferring the case to the equity side of the court. The bill slightly enlarged the allegations of the notice of motion, but not the effect. It charged that the defendant arbitrarily violated the written contract, thereby depriving the plaintiff of the profits he

would have made under the contract had it been permitted to be continued.

The defendant demurred to the bill of complaint, and for grounds of its demurrer alleged—(1) That the bill failed to set forth any fact showing that the defendant terminated the contract in bad faith; (2) that it showed on its face that the defendant cancelled the contract for just cause; (3) that it failed to show that the plaintiff was damaged; and (4) that the damages claimed were purely speculative.

It likewise filed an answer and cross-bill, in which it denied the material allegations of the bill, and set out a breach of the contract by the plaintiff. It further alleged that it had advanced the plaintiff more money than was called for by the contract; that the plaintiff owed the defendant $3,045.87, which had been advanced him in excess of the amount to which he was entitled; that the plaintiff had obtained lucrative employment after the contract was terminated, whereby he earned more than he would have earned if he had continued under the contract; and that the contract was terminated strictly in accordance with its terms and for just cause. There was no answer filed to the cross-bill.

Evidence was then taken before the court, and decree was entered for the defendant in the sum of $879.81.

The plaintiff assigns as error the action of the trial court in transferring the action to the equity side of the court. He further contends that the decree was contrary to the law and the evidence. The defendant contends that the case involved no issue of fact to be submitted to a jury; but involved only a legal interpretation of the terms of the contract; that the plaintiff waived trial by jury; that the contract gave the defendant the right to terminate the contract; that the evidence shows that the plaintiff committed the first breach of the contract; and that the judgment for the defendant is based on plaintiff's admissions.

With the foregoing statement of the proceedings, it is necessary to consider the evidence and circumstances of the case, which may be summarized as follows:

The Southern Churchman, Inc., a Virginia corporation, is engaged in publishing and circulating "The Southern Churchman," a religious newspaper, which has been in existence over one hundred years, and is devoted to the teaching and promotion of the welfare of the members of the Protestant Episcopal Church. It is operated and controlled by a board of directors, of which Bishop H. St. George Tucker of the Diocese of Virginia is president. It has no financial or official connection with the Protestant Episcopal Church. It seems to have been operated as a non-profit-paying paper, supported by its subscribers, its advertisers, voluntary donations and church favors.

Austin T. Quick had been engaged, at various times during the years from 1930 to 1934, in work for this corporation and for a similar publication in another State.

In the early part of November, 1934, negotiations were entered into between the plaintiff and officers of the defendant, with reference to securing the services of the plaintiff for the promotion of the welfare of "The Southern Churchman." The plaintiff had theretofore submitted his ideas for improving the circulation and financial departments of the newspaper.

On November 15th, the defendant submitted a draft of an agreement, purporting to cover the points discussed and agreed to between the parties.

The original draft of the proposed contract for Quick's services was then redrafted by Quick, and, in that form, was executed by the parties hereto.

The contract, in full, contained the following terms and provisions:

"That for the purpose of increasing the circulation of the Southern Churchman by the procurement of additional subscribers for that publication, the said Quick undertakes and agrees to solicit such subscriptions, and in furtherance of that object to organize and employ representatives, not exceeding sixteen members, to cooperate with him, and under his supervision, in such work in territory to be selected by the Southern Churchman Company, and at the rates for subscriptions prescribed by said Company, and,

"The said Quick further undertakes and agrees to solicit, and use his best efforts to secure cash donations and contributions to a capital fund for the payment of the debts of the said Southern Churchman Company and for the support and maintenance and improvement of the Southern Churchman Company's publication, and,

"The said Quick also undertakes and agrees to solicit and procure advertising to be inserted in said publication at rates to be prescribed by the Southern Churchman Company, and,

"The said Quick also undertakes and agrees to lend and give his best efforts to the Southern Churchman Company for the improvement, maintenance and the general good of said publication,

"Provided That:

"The Southern Churchman Company undertakes and agrees to at once improve the publication as to paper stock, type, general set up, and articles and departments contained therein, and to increase the size of the publication from sixteen pages to a minimum of twenty-four pages, and to cooperate with said Quick in any correct manner so that the publication will be properly received and welcomed by the majority of the Bishops, Clergy and Laity of the Protestant Episcopal Church, and,

"That the Southern Churchman Company undertakes and agrees to raise a sum of money not to exceed Three Thousand Dollars ($3,000.00), should a total amount be necessary, which sum is to be used solely for the purpose of financing the securing of new subscriptions, the preliminary expenses involved in securing donations and contributions for the paying of debts and maintenance of the publications, and for the preliminary expenses involved in the securing of advertising for the publication, and, that

"The Southern Churchman Company undertakes and agrees to pay said Quick a commission of One Dollar and Ninety Cents ($1.90) for each new annual subscription procured and remitted to it for which full payment shall

have been received, and a proportionate commission for each new subscription taken for less than a year on the same conditions as to payment. A 'new subscription' is one which has been off the mailing list for a period of four months. From the above commissions paid, said Quick undertakes and agrees to pay said subscription Representatives of the publication and to assume the direction and responsibility for the circulation work. Such payments of commissions to be made weekly as reports of subscriptions taken are received on the basis of the number of signed or fully paid subscriptions contained in the reports, and, in view of the fact that it is understood and agreed hereto that any commission paid on any subscription which may be cancelled or not paid for by the subscriber shall be Deducted from the Commission Check the first of each month for all such cancellations or unpaid for subscriptions occurring or defaulting during the previous month, said Quick shall receive commissions on any new subscriptions coming in direct to the publication for the next six months period from the territory he or the Representatives under him may have worked. It is understood and agreed that any new subscriber who fails to meet the payment for the subscription within a reasonable time of the due date shall be dropped as a subscriber and such commissions as may have been paid shall be deducted from said commission check, and, that,

"The Southern Churchman Company further undertakes and agrees to pay said Quick a commission of Twenty per cent of the amount of all cash funds and obligations he may procure, either personally or by his directions, for the capital fund to be raised for the payment of debts and the maintenance and support of the publication,

"And, further, the Southern Churchman Company undertakes and agrees to pay said Quick Thirty per cent of the value of all advertising procured by him or at his discretion, to be inserted in said publication, provided, that no commission is to be paid on any advertisement secured by him

or at his direction which is now carried or has been carried by the publication since July 1, 1934.

"This Agreement to continue for the period of two years from the date given below and to be subject to renewal for similar terms at the option of the parties hereto. It may be terminated, however, for just cause by either party hereto upon thirty days' written notice.

"Executed in duplicate this 27th day of November in the year 1934.

> "SOUTHERN CHURCHMAN COMPANY
> "By H. ST. GEORGE TUCKER, President.
> "AUSTIN TUNIS QUICK."

The plaintiff secured and employed, on an average, seven or eight representatives to assist him in performing the work under the contract. They began work about the 5th of December, 1934. As a result, the subscriptions to the newspaper were increased from 2,800 to approximately 8,000 in the first eight working months. Donations were secured amounting to $3,035, and advertisements amounting to $255.50.

During the period to August 17, 1935, there was advanced by the defendant to Quick, in sums from week to week, a total of $7,409.13, and there was retained by Quick, or by his representatives for whom he was responsible during the same period, out of payments to them for subscriptions secured, the sum of $3,246.45, a total of $10,655.58. For the same period, Quick was entitled to have drawn for commissions on subscriptions, donations and advertisements, the sum of $9,775.77, leaving the admitted sum of $879.81, paid in advance and in excess of the amount to which Quick was entitled.

This balance was due to the fact that there had been many cancellations of the orders given for subscriptions, some of which had been cancelled at the request of the subscribers and others because of the inability of the plaintiff or the defendant to collect therefor.

At the commencement of the campaign, the defendant, with the aid of the endorsement of Bishop Tucker, bor-

rowed $2,000, which was put in a special fund, out of which advances were made to Quick as he required the money. This constituted a part of the total advances heretofore mentioned, amounting to $7,409.13.

The defendant also, by virtue of the contract, increased the size of its paper from sixteen to twenty-four pages, at an increase in the cost of production, mailing and postage.

In the beginning, the financial situation of the newspaper seems to have been easy because of the donations. However, donations stopped coming in. Printing costs increased. Approximately twenty-five per cent of the subscriptions sent in had to be cancelled for non-payment thereof, and the financial situation became rather desperate. Quick was acquainted with this situation. Nearly every week he would go to the defendant, and request an advance of money to pay the men soliciting subscriptions. He explained to Bishop Tucker, who personally advanced some of the money, that he had no money to finance further expenses. In fact, he was so well acquainted with the situation that on May 9, 1935, he addressed a letter to the defendant, which stated, "In view of the general situation of the Southern Churchman, to finance the continued publication of the paper, I have the following to offer:— * * * ." In this letter, he stated that he could secure the necessary funds from a personal friend, "who will back me financially, the present publication costs, the circulation work and all matters of a general nature necessary to continue the paper." He further offered to assume liability for all past, present and future indebtedness of the paper not to exceed, as of that date, $14,000, provided that when the said indebtedness was satisfied, the capital stock of the corporation was to be assigned to him.

In the meantime, the representatives and agents in the field, employees of Quick, were demanding advances of money, which Quick admitted he was unable to pay them. The defendant had advanced much more than the sum of $3,000, and was unable to advance more. Instead of im-

proving its financial condition, its indebtedness was gradually and assuredly becoming worse.

Quick admitted, before August, 1935, that he was unable to make the necessary advances to keep his agents in the field. He also admitted that the statement furnished by the defendant was correct in showing that he had overdrawn his account prior to the termination of the contract on September 1, 1935, in the sum of $879.81.

In view of the above conditions, numerous conferences were had between the plaintiff and the officers of the defendant. On August 2, 1935, the defendant notified Quick of its intention to terminate the contract, in the following language:

"Dear Mr. Quick:

"Mr. L. M. Williams, Jr., and Mr. Otto Williams discussed the affairs of the Southern Churchman with you at length yesterday. They pointed out to you, I am informed, that the paper is insolvent, that the campaign for subscriptions is running it further into debt, and that your account is overdrawn by something like $1,400. You say you need more money to carry on the campaign and also that you are unable to pay the money you owe. I do not know how additional money could be raised for the campaign fund, and, indeed, I was under the impression that the money borrowed on my indorsement would have been paid off before this. Under the circumstances I feel compelled to notify you that your contract to conduct the subscription campaign is hereby cancelled, in accordance with the terms of your contract with the Southern Churchman, in thirty days from the date of this letter. In the meantime, the treasurer of the company has been advised not to make any further advances to you, and I earnestly hope that you will be able to repay the advances you have already received in excess of the amounts called for by the contract.

"Yours very truly,

"(Signed) H. St. George Tucker, President."

The entire evidence, notwithstanding the nature of the litigation, singularly and fortunately, shows a lack of bitterness between the parties. This situation is further evidenced by the fact that on August 2nd and August 7, 1935, Bishop Tucker and the secretary and manager of the defendant, respectively, gave Quick letters of recommendation. In addition, on August 26th, another officer of the defendant offered to employ Quick to solicit subscriptions on a new basis, with commissions to be paid out of the cash collected.

None of the above evidence was in dispute, nor were the reasons assigned for a termination of the contract denied. The evidence, therefore, presents no conflict of facts. All essential facts are admitted, and there was no issue of fact to be presented to a jury. On the facts only one proper result can be reached.

The sole questions are questions of law.

 The notice of motion and all the pleadings show that the action was one purely at law, where there was a complete and adequate remedy. Virginia Code 1936, section 6084, authorizes the transfer of cases from one side of the court to another only where the case is brought on the wrong side of the court. It gives no authority for the arbitrary transfer of a case, with or without motion of the parties, except where the question of a proper jurisdiction of the subject matter is involved. The statute is remedial and not technical. It was enacted to protect the rights of the parties, and to save costs and delay. *French* v. *Stange Mining Co.*, 133 Va. 602, 114 S. E. 121; *Sacks* v. *Theodore,* 136 Va. 466, 118 S. E. 105; *Colvin* v. *Butler,* 150 Va. 672, 143 S. E. 333.

 It must be admitted that a party has a right to a trial by jury, when the facts are in conflict. In such a case, to deprive a person of that right is a denial of a substantive right. Unquestionably, however, the right may be waived, and it is equally true that if there is no issue of fact to be submitted to a jury, and there is nothing to be decided by a jury, a denial of a jury trial is not a denial of a substantive right.

■ There was no express waiver here of a jury trial, nor was there any proper objection to the action of the court in removing the case from the jury. If there was any such objection, it was not preserved by an exception in the record. The allegation in the bill of complaint that objection was made is merely a statement of one of the parties, and not a certificate endorsed by the judge. The grounds of the objection are not stated.

■ In this case, the bill in equity set forth a cause of action identical with the previous notice of motion. The plaintiff was not obliged to file his bill in equity. The order directing the transfer could have been treated as appealable. The plaintiff could have stood on his right to proceed at law. Instead he seems to have chosen to take his chances in equity. *Colvin* v. *Butler, supra.*

■■ The question, however, is not so much whether the plaintiff could or did waive his right of trial by jury, or whether he can take advantage of the error on appeal here; but rather whether he has been prejudiced by the error. The error was an error as to the form of procedure, and not as to the merits of the case. If no other proper verdict or judgment could have been reached, the error must be regarded as harmless, for it would be harmless if the plaintiff did not suffer prejudice thereby. Virginia Code 1936, section 6331.

■ The courts must regard substance rather than form. They are created to correct errors and irregularities that are prejudicial to the substantial rights of the party assigning them, and not to correct all irregularities that may occur on the trial of a case. *Rinehart & Dennis Co.* v. *McArthur,* 123 Va. 556, 96 S. E. 829.

In the case of *Sacks* v. *Theodore, supra,* the trial court erroneously refused to transfer a case brought in equity to the law side of the court. There the facts were in conflict, and the court awarded an issue out of chancery to ascertain the damages, if any. On appeal, the error was held to be harmless because a trial by jury accorded to the parties every substantial right.

■■■ The next question is whether the defendant, under the admitted facts, had a right to terminate the contract. This is purely a question of law. The provision in the contract relating thereto provides that it may be terminated by either party "for just cause" upon thirty days written notice.

■■■ It is obvious that "just cause" or "good cause" is not synonymous with legal cause. The right to cancel for a legal cause exists independently of the contract. One can terminate any contract for legal cause. No extension of time is required after a notice therefor. On the other hand, "just cause" or "good cause" cannot be reduced to a legal certainty. To be effective, it must relate to the circumstances relied on. The grounds upon which it is based must be reasonable, and there should not be an abuse of the conferred right. It must be a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. It limits the party to the exercise of good faith, based upon just and fair grounds as distinguished from an arbitrary power. To this extent, it includes causes outside of legal causes.

The clause in question is not often found in contracts coming before the courts. In the few cases cited to us, the decisions hold that such a clause permits cancellation upon other than legal grounds, when the power is exercised in good faith upon fair and reasonable grounds. *May* v. *May*, 167 U. S. 310, 17 S. Ct. 824, 42 L. Ed. 179; *Cummer* v. *Butts*, 40 Mich. 322, 29 Am. Rep. 530; *Starin* v. *United States* (U. S.), 31 Ct. of Cl. 65.

■■■ The evidence shows that the venture had failed. The plaintiff and the defendant were each admittedly insolvent, certainly so far as funds were required for the prosecution of the venture. No donations or contracts for advertisements had been received for several months. It was costing more to publish and circulate the paper than the defendant was realizing therefrom. Quick had been advanced, from time to time, more than $3,000. He had failed to pay the expenses of the promotion campaign from his commissions.

■

He had overdrawn a sum in excess of the amount he was entitled to under the contract. Approximately twenty-five per cent of the subscriptions were being cancelled for lack of payment by the subscribers. Both parties were going further and further into debt every month. All these facts and circumstances were fully and fairly known to each of them, and discussed by them. The situation was that neither of them was able to fairly fulfill the provisions of the contract, nor to realize their first expectations. A termination of the contract relation would manifestly avoid further loss to each of them. There was nothing to indicate that conditions would improve in the future. No advantage to either could be gained by continuing the precarious situation. The entire circumstances afforded good and just grounds for bringing the contract to an end.

Nowhere is the testimony of the defendant's officers denied, or contradicted. The evidence discloses that the notice of cancellation was given in good faith. The facts therein contained, except as to the amount of money originally claimed to be due from the plaintiff, are admitted to be true. The erroneous amount claimed was corrected upon a proper audit.

Quick did not disagree with the material facts contained in the letter or notice of cancellation of August 2nd. He admitted that he was unable to perform his part of the contract, and to keep his representatives in the field, for lack of money. This latter admission, with the consequences necessarily following therefrom, if it did not actually constitute a legal breach of the contract under the circumstances, taken in connection with the other facts, furnished an additional ground for termination of the contract.

The conclusion we have reached makes it unnecessary to discuss the question of damages, if any, to the plaintiff. He estimates that if his agents, in the future, could bring in larger additional subscriptions, could sell considerable advertising space, and induce further donations, his profits would amount to large sums. These estimates

are based upon circumstances entirely contingent upon the existence of many favorable conditions, conditions which would have to be much more favorable than those which had already existed. There is no degree of certainty what-ever that the business could have been procured, nor the estimated amount of profits realized. The figures are based on pure conjecture, and denied by the experience of an eight months trial. The damages suggested are much too specula-tive and conjectural. *Sinclair Refining Co.* v. *Hamilton & Dotson,* 164 Va. 203, 178 S. E. 777, 99 A. L. R. 929; *Atlantic & Danville Ry. Co.* v. *Delaware Const. Co.,* 98 Va. 503, 37 S. E. 13; *Grubb* v. *Burford,* 98 Va. 553, 37 S. E. 4; *Bristol Belt Line R. Co.* v. *Bullock Electric Mfg. Co.,* 101 Va. 652, 44 S. E. 892.

It may also be here noted that the plaintiff admitted that he had been employed, after the cancellation of the contract, as a major in the Reserve Corps of the United States Army, from September 25, 1935, to March 2, 1936, for which he received the sum of $2,295.

The defendant does not pray for a new trial of this case upon the ground of its cross-assignment of error, that the amount of the judgment should be increased to cover the cancellation of additional subscriptions subsequent to the termination of the contract. The evidence of such sub-sequent cancellations and of the conditions surrounding the cancellations, is not sufficiently stated to base a finding thereon. We are unable to say, in view of the time and manner in which these cancellations were made, that the defendant is entitled to recover therefor.

For the foregoing reasons, we are of opinion that there is not sufficient error upon which to base a reversal of the decree of the trial court. We can see no advantage to be gained in granting a new trial merely to save a technical point of law, or to gratify a private opinion when the same result must be reached in any proper proceeding. As im-portant as it may be to have approved rules to secure jus-tice, it is much more important that justice as an end be attained.

The decree against the plaintiff is for the smallest amount that could have been found against him. Since that conclusion has been reached, no possible good can be served the plaintiff by sending the case back to be tried in a court of law. The only result would be to delay a judgment for the amount already found, and penalize both parties with additional delay and further costs of litigation.

The decree of the trial court is affirmed.

*Affirmed.*

CAMPBELL, C. J., dissents.