Betty J. SETTERBERG and Robert
W. Setterberg, d/b/a W & B
Express, Appellants,

v.

SHEAFFER EATON, INC., Appellee.

No. 90–186.

Court of Appeals of Iowa.

May 29, 1991.

Steven R. Hahn of Ruther, Bauer, Schulte, Hahn, Swanson & Crowley, Burlington, for plaintiffs-appellants.

Gregory A. Johnson of Johnson & Skewes, Fort Madison, for defendant-appellee.

Considered by DONIELSON, P.J., and SCHLEGEL and HAYDEN, JJ.

DONIELSON, Presiding Judge.

The Setterbergs brought this action for breach of contract against Sheaffer Eaton, Inc. The contract between the parties called for the plaintiffs, the Setterbergs, to provide trucking services for the defendant, Sheaffer Eaton, Inc. When the defendant's parent company sold one of defendant's product lines, the defendant could no longer provide the plaintiffs with enough trucking loads to meet the contractual requirements for the remainder of the contract term. Under the terms of the parties' written agreement, the district court concluded that the defendant had canceled its contract with the plaintiffs "for good cause." Accordingly, the court found that the defendant had established a complete defense to the plaintiffs' lawsuit and dismissed it.

On appeal plaintiffs first maintain that defendant terminated the contract on July 14, 1988, rather than mid-February 1988 as found by the trial court. Building on the first contention, plaintiffs contend they had a right, at a minimum, to receive contractual payments for twelve delivery trips during the 1988 year. Third, plaintiffs allege the district court erred in determining that any right plaintiffs had to recovery should be diminished by funds received from shipping for another party. Finally, plaintiffs contend the defendant did not have good cause for canceling the contract. We now affirm.

I. *Facts.* The Setterbergs operated their trucking business under the name W & B Express. For thirty years the Setterbergs' trucking company had transported finished products and raw materials for Sheaffer Eaton, Inc. and its predecessor corporations. Sheaffer Eaton, during much of the time relevant to this appeal, was a subsidiary of Textron, Inc.

Sheaffer Eaton had been formed by the consolidation of two corporate divisions of Textron, Inc.: Sheaffer Pen Co., located in Fort Madison, Iowa, manufactured writing pens and other products, and Eaton Paper Co., located in Massachusetts and Michigan, manufactured paper, puzzles, and folders.

On May 5, 1986, W & B Express and Sheaffer Eaton entered into a new three-year contract, drafted by Robert Setterberg. Significant portions of the contract language were drawn from previous contracts between the parties. However, the contract was much shorter and simpler than prior contracts as a result of the fact the trucking industry had been deregulated and certain Interstate Commerce Commission contract requirements no longer applied. The contract consists of two pages of text and attached rate schedules. The contract provided that the trucking company would haul a minimum of seventy-five truckloads of Sheaffer Eaton products out of Fort Madison, Iowa, to the east coast and return with a minimum of seventy-five truckloads each contract year.

Paragraph eleven provided:

This Agreement shall become effective on the 5th day of May, 1986, and shall terminate on the 5th day of May, 1989. At the termination of the three-year term of this Agreement, *which shall be non-cancelable by either party except for good cause*, the parties agree that the contract shall be automatically renewed from year to year, upon the same terms and conditions, except as may be amended from time to time, but shall be cancelable, after the expiration of said terms, upon ninety days written notice by either party.

(Emphasis added.) [1]

On August 28, 1987, Textron, Inc. sold its Sheaffer Eaton division to Gefinore, Inc.

---

1. The paragraph was actually written as follows:

This Agreement shall become effective on the

Gefinore was a holding company and its only asset consisted of Sheaffer Eaton. Sheaffer Eaton was incorporated as a separate entity but two of its directors were also directors of Gefinore. Gefinore purchased Sheaffer Eaton by initially borrowing forty million dollars from various financial institutions. Sheaffer Eaton's assets were pledged as security. Gefinore planned to repay the lending institutions from funds raised by a private stock offering.

In October 1987, there was a drastic collapse on the stock market commonly known as "Black Monday." Potential investors for Gefinore's plan vanished. In early 1988, in order to keep itself and Sheaffer Eaton out of bankruptcy, Gefinore sold the paper products portion of the business. The central distribution warehouse in Fort Madison was sold due to resulting decreased need.

The sale of the paper products division affected Sheaffer Eaton's ability to meet its contractual obligations with the Setterbergs' trucking business—from 1988 to 1989 Sheaffer Eaton's shipping (to all destinations) decreased by approximately 75 percent. In February 1988, representatives of Sheaffer Eaton met with Robert Setterberg and orally advised the Setterbergs that as a result of the sale, shipping requirements would be greatly reduced. Sheaffer Eaton would have little or nothing for W & B Express to haul and therefore their trucking services were no longer needed. At that particular time, Sheaffer was actually ahead of schedule in terms of providing a minimum of seventy-five truckloads during that contract year.

Oral negotiations continued between the parties in an attempt to resolve their differences. A temporary arrangement was reached under which W & B Express hauled occasional loads east for Sheaffer Eaton and returned with truckloads arranged for by Setterberg. On July 14, 1988, Mr. Waltz from Sheaffer Eaton made a written offer of settlement of $18,750 to compensate the Setterbergs for the twelve trips they would not be able to haul for the 1988 contractual year. Waltz's letter also included the following:

> One additional item, in response to Mr. Hahn's [plaintiffs' attorney] question as to the potential number of trips that you will make for us in [contract] year three, be advised as follows:
>
> The situation is as discussed by you and Earl Shrawder in February and several times since. To repeat, that portion of our business that generated the need for your service was sold in February. Since February, we have continued shipping the products as part of a temporary arrangement with the new owner.
>
> That temporary situation is now over and you are hereby advised that your services under the subject contract are no longer required. If your services are needed, independent of this contract, we may contact you. In the meantime, since you will no longer be performing services under this contract, I would repeat Earl's earlier suggestion that you seek other business to replace it.

About July 28, 1988, W & B Express began hauling freight for Sharkey Trucking Company under a lease agreement.

On July 29, 1988, the Setterbergs' filed a petition alleging breach of contract and asking for a judgment against Sheaffer Eaton for the lost profits they were expected to make on the eighty-seven trips they would have made in 1988 and 1989 had they continued to haul for Sheaffer Eaton. Sheaffer Eaton answered and affirmatively

5th day of May, 1986, and shall terminate on the 5th day of May, 1989. At the termination of the three-year term of this Agreement, which shall be non-cancellable [sic] by either party except for good cause. The parties agree that the contract shall be automatically renewed from year to year, upon the same terms and conditions, except as may be amended from time to time, but shall be cancellable [sic], after the expiration of said terms, upon ninety days written notice by either party.

The district court noted that the second sentence of this paragraph is in fact a sentence fragment. It looked to extrinsic evidence and concluded the second and third sentences were meant to be read as one sentence. The parties do not challenge this conclusion and, therefore, we review this case construing the paragraph as did the trial court.

pleaded, inter alia, that it had canceled the contract for good cause. The matter proceeded to a trial before the district court which concluded that plaintiffs were not entitled to recover. The district court found good cause existed for the cancellation of the contract. It further found Sheaffer Eaton had canceled the contract in mid-February at a time when it was ahead on its promised trucking runs. Consequently, the district court dismissed plaintiffs' petition.

On appeal the plaintiffs raise four assignments of error. We will not address the assignments in the same order as have the parties, nor will we address all assignments, because we find the plaintiffs' last contention addresses the crux of this matter.

■ II. *Scope of Review.* As this case is a law action, we review the district court's decisions for correcting errors of law. Iowa R.App.P. 4. In cases tried to the court, findings of fact have the effect of a special verdict and are binding on us if supported by substantial evidence. *Hamilton v. First Baptist Elderly Hous. Found.,* 436 N.W.2d 336, 338 (Iowa 1989). Evidence is substantial when a reasonable mind could accept it as adequate to reach the same finding. *Id.* However, we are not bound by trial court determinations of law. *Nora Springs Co–Op Co. v. Brandau,* 247 N.W.2d 744, 747 (Iowa 1976).

III, *Good Cause.* In their fourth brief point plaintiffs assert that the cancellation of the contract cannot be excused for good cause because Sheaffer Eaton did not prove impossibility of performance. The plaintiffs believe that a parent corporation's decision to pay a debt is not a sufficient legal excuse to cancel an otherwise valid agreement.

It is implicit in plaintiffs' argument that they define "good cause," as synonymous with the legal excuse of impossibility. The doctrine of impossibility of performance excuses a party's nonperformance

> generally where that which has been promised becomes *objectively* impossible to perform due to no fault of the nonperforming party. However, ordinarily a

contingency which reasonably may have been anticipated must be provided for by the terms of the contract, or else the impossibility of performance resulting therefrom does not operate as an excuse.

*Nora Springs Co–Op Co.,* 247 N.W.2d at 747 (emphasis in original).

■ In order to decide the appeal we must review the trial court's interpretation of the phrase, "noncancelable except for good cause." Interpretation, the process of determining the meaning of the words used, is a matter for the court to decide as a matter of law, unless it depends upon extrinsic evidence or choices among reasonable inferences to be drawn from it. *Chard v. Iowa Machinery & Supply Co.,* 446 N.W.2d 81, 83 (Iowa App.1989). When interpreting a contract, we seek to give effect to the language of the entire contract in accordance with its commonly accepted and ordinary meaning. *Home Federal Savings & Loan Ass'n v. Campney,* 357 N.W.2d 613, 617 (Iowa 1984). Words of the contract are interpreted in the context in which they are used. *Id.*

■ We note initially that the contract was drafted by Robert Setterberg and therefore any ambiguities or uncertainties are to be construed against plaintiffs. *See Rector v. Alcorn,* 241 N.W.2d 196, 202 (Iowa 1976).

■ "Good cause" is not defined in the contract. The district court concluded that the inclusion of the phrase, "noncancelable except for good cause" allowed the contract to be canceled for grounds other than those which would provide a legal excuse. We agree.

> It is obvious that "just cause" or "good cause" is not synonymous with legal cause. The right to cancel for a legal cause exists independently of the contract. One can terminate any contract for legal cause. No extension of time is required after a notice therefor. On the other hand "just cause" or "good cause" cannot be reduced to a legal certainty. To be effective, it must relate to the circumstances relied on. The grounds upon which it is based must be reason-

able, and there should not be an abuse of the conferred right. It must be a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. It limits the party to the exercise of good faith, based upon just and fair grounds as distinguished from an arbitrary power. To this extent, it includes causes outside of legal causes.

*Quick v. Southern Churchman Co.*, 171 Va. 403, 417, 199 S.E. 489, 494–95 (1938) (quoted with approval in *Bd. of Educ. v. Youel*, 282 N.W.2d 677, 680 (Iowa 1979), in defining "just cause" as used in Iowa Code section 279.15). We conclude Sheaffer Eaton had the right to cancel the contract for reasons other than those which would provide a legal excuse.

The district court interpreted the "good cause" phrase as meaning the contracting parties were conferred the right to cancel the contract in good faith for grounds which were reasonable, fair and honest. We believe this interpretation properly captures the meaning of the phrase as intended by the parties.

The trial court made the following findings of fact: Sheaffer Eaton orally canceled the trucking contract in February 1988. The contract was canceled due to the sale of Sheaffer Eaton's paper product line by its parent corporation, Gefinore. The sale was necessitated by the unforeseen stock market collapse and the resulting economic difficulty in which Gefinore found itself. The alternative to a sale of substantial assets was that both Gefinore and Sheaffer Eaton would be bankrupt. In the event of bankruptcy, W & B Express would not get the benefit of its contract with Sheaffer Eaton. The district court concluded the contract was canceled "for good cause."

The district court's findings are supported by substantial evidence and therefore binding upon us. We find no error.

IV. *Notice.* Plaintiffs contend the trial court erred in finding the contract was canceled in February. They allege the contract called for written notice of cancellation. Because no written notice was given to the Setterbergs until July 1988 they allege they are entitled to recover, at a minimum, for the shortfall of twelve trips for the 1988 contract year.

Paragraph eleven of the parties' contract provided in part:

At the termination of the three-year term of this Agreement ... the parties agree that the contract shall be automatically renewed from year to year ... but shall be cancelable, after the expiration of said terms, upon ninety days written notice by either party.

The district court found this paragraph unambiguously required ninety-day written notice only if the contract was canceled during an automatic renewal period following completion of the three-year contract. We, too, find the notice provision unambiguous. We reject plaintiffs' contention that written notice was required for cancellation during the three-year contract term.

Because we have concluded Sheaffer Eaton had the right to cancel the contract and did cancel the contract plaintiffs' breach of contract action must fail. We need not address the remainder of plaintiffs' assignments of error.

AFFIRMED.