McFARLAND, SUPERVISOR OF PUBLIC ACCOUNTS OF LOUISIANA, *v.* AMERICAN SUGAR REFINING COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 847.   Argued April 11, 12, 1916.—Decided April 24, 1916.

Act No. 10 of the Extra Session of the General Assembly of Louisiana for 1915, relating to the business of refining sugar and creating the rebuttable presumption that any person systematically paying in that State a less price for sugar than he pays in any other State is a party to a monopoly or conspiracy in restraint of trade, *held* unconstitutional under the equal protection and due process provisions of the Fourteenth Amendment; the classification therein, if not confined to a single party, being so arbitrary as to be beyond possible justice, and the presumptions created having no foundation except on intent to destroy.

While the legislature may go far in raising presumptions and changing the burden of proof, there must be rational connection between the fact proved and the ultimate fact presumed.

It is not within the province of the legislature to declare an individual guilty, or presumptively guilty, of a crime.

A statute must fall as a whole, if it falls in sections without which there is no reason to suppose it would have been passed.

229 Fed. Rep. 284, affirmed.

THE facts, which involve the constitutionality under the commerce clause of, and the Fourteenth Amendment to, the Federal Constitution of Act No. 10 of Louisiana of 1915, relative to, and regulating the business of, refining sugar, are stated in the opinion.

*Mr. Donelson Caffery* and *Mr. Harry Gamble*, with whom *Mr. Ruffin G. Pleasant*, Attorney General of the State of Louisiana, and *Mr. Daniel Wendling* were on the brief, for appellants.

*Mr. James M. Beck*, with whom *Mr. Joseph W. Carroll*, *Mr. George Denegre*, *Mr. Hugh C. Cage* and *Mr. Frank L. Crawford* were on the brief, for appellee.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill in equity brought by a New Jersey corporation, the appellee, against the Inspector of Sugar Refining, the Governor and the Attorney General of Louisiana, to prevent the enforcement of Act No. 10 of the Extra Session of the General Assembly of that State for 1915. The grounds of relief are the commerce clause and the Fourteenth Amendment of the Constitution of the United States.

The plaintiff was granted a preliminary injunction by three judges in the District Court and the defendants appealed. 229 Fed. Rep. 284.

A summary of the statute is as follows: The business of refining sugar is declared to be impressed with a public interest 'by reason of the nature and by reason of the monopolization thereof,' and on that footing the regulations are made. After providing for elaborate reports and inspection of books by the Inspector the act imposes for the benefit of the Inspection Fund a tax of one-half cent for every three hundred and fifty pounds of granu-

lated sugar made. It then makes it unlawful to buy sugar on an *ex parte* test of quality, &c., and proceeds to authorize the Inspector to make such reasonable regulations not only concerning that, but affecting any branch of the business of sugar refining, as he may deem proper and as may be conducive to the public interest, and to the prevention of monopoly in the business or to the protection of the public from its consequences. Then come the provisions chiefly in issue here. By § 7 "any person engaged in the business of refining sugar within this State who shall systematically pay in Louisiana a less price for sugar than he pays in any other State shall be *prima facie* presumed to be a party to a monopoly or combination or conspiracy in restraint of trade and commerce, and upon conviction thereof shall be subject to a fine of five hundred dollars a day for the period during which he is adjudged to have done so"; his license to do business in the State is to be revoked, and any foreign corporation (such as the plaintiff is) is to be ousted from the State and its property sold. If irreparable injury to the public interest is shown in such a case the court may appoint a receiver at any stage of the proceedings, &c. By § 8 if shown by affidavit or otherwise either *in limine* or after trial that any refinery has been closed or kept idle for more than one year it shall be presumed to have been done for the purpose of violating this act or the laws against monopoly, &c., and if the counter evidence does not rebut the presumption the court shall order the owner to sell the refinery within six months and if that is not done shall appoint a receiver to do it within twelve months. In computing the year of idleness any plant shall be treated as idle that has not been operating *bona fide*. By § 9 in suits for ouster, &c., upon showing by the State that the monopoly, &c. are detrimental to the public welfare, an injunction may be issued or a receiver appointed, after a hearing, subject to an appeal return-

able within five days to be determined within forty days,
&c. By § 10 a fine of from fifty to twenty-five hundred
dollars a day is imposed for violations of the act not other-
wise provided for or of any of the regulations promul-
gated by the Inspector. By § 11, in suits under the act,
books, letters and other documents, 'or apparent copies
thereof,' of the defendant shall be given effect as being
what they purport to be and 'as establishing the facts
carried on their face' unless sufficiently rebutted, upon
proof of their having been in the possession or control of
the defendant; and any report of any legislative commit-
tee of the State, or of the Senate or House of Representa-
tives of the United States, or of any bureau, department,
or commission acting under the authority either of the
State or of the Senate or the House of Representatives of
the United States, and the records of any court of any
State, or of the United States are made *prima facie* evi-
dence of the facts set forth therein, subject to rebuttal. In
conclusion, by § 15 the business of refining sugar is de-
fined to be "that of any concern that buys and refines
raw or other sugar exclusively, or that refines raw or other
sugar from sugar taken on toll, or that buys or refines
more raw or other sugar than the aggregate of the sugar
produced by it from cane grown and purchased by it."

Besides the allegations that bring the plaintiff within
the purview of the act, the claims of the protection of the
Constitution, and the invocation of the principle of *Ex
parte Young*, 209 U. S. 123, for equitable relief, the bill sets
forth some facts that throw special light upon the case.
First for the bearing of § 8, it shows that formerly the
plaintiff purchased a consolidated refinery called the
Louisiana Refinery, increased its capacity to 2,500,000
pounds daily and worked it until 1909. It then built at
a cost of about six million dollars a new refinery at Chal-
mette with a daily melting capacity of 3,000,000 pounds
since increased to 3,500,000. It then closed the Louisiana

Refinery as it could not distribute from New Orleans more refined sugar than could be made at Chalmette. The machinery of the Louisiana Refinery is comparatively antiquated and could not be operated economically, although in case of the destruction of the Chalmette plant it could be used as a substitute at considerable expense and after some delay.

As to the presumption created from the systematic paying in Louisiana a less price for sugar than is paid in any other State, the bill alleges that the plaintiff purchases on an average less than one-half of the Louisiana sugar crop, of which half over a third is shipped as bought, to the plaintiff's northern refineries, so that not much over thirty per cent. is melted at Chalmette. In fact only a comparatively small portion of the plaintiff's meltings in Louisiana is of sugar produced in Louisiana, the remainder having been imported. The chief port for the receipt of raw sugar imported is New York, at or near which there are seven large refineries now in operation.—The Louisiana sugar customarily has been brought on the market in November and December, during which months it is pressed for sale in amounts far in excess of the requirements of all the refineries in the State. Purchasers therefore had either to ship a part north or to store it with consequent loss from deterioration and in weight, interest, and cost of storage and insurance, and at the risk of a decline in the market. These elements necessarily affect the price, which cannot be higher than that in the ultimate market less the cost of transportation, and which has been approximately that. Furthermore the period of storage is a time when the market for raw sugar generally declines and the price of refined sugar follows that of raw to the refiner's loss.

Formerly a large part of the sugar manufactured in Louisiana by the plaintiff was sold in the middle west and in Minnesota, Iowa, the Dakotas, &c., and it was to meet

that market that the Chalmette refinery was built. But the great and rapid increase in the production of beet sugar, which now forms one-sixth of all the sugar consumed in the United States and is sold at prices below those of cane sugar, has driven the plaintiff out of those markets to a great extent. The result frequently has been that the plaintiff has derived little or no advantage from the purchase of Louisiana sugar even when bought at a less price than that in New York on the same day.

The bill also shows fully that the plaintiff melts solely on its own account so that its only contact with the public is as a buyer of raw and a seller of refined sugar and its business is affected with a public interest not otherwise than as any other business is, according to its importance and size. It also shows that much the greater part of its Chalmette commerce both in purchase and sale is foreign or among the States. There are other allegations besides those that we have summed up but enough has been stated to disclose the plaintiff's case.

The answer alleges that the plaintiff is a monopoly and combination in restraint of trade in buying, refining and selling sugar throughout the United States and completely controls the sugar trade in Louisiana and sets forth a long series of letters thought to show efforts to obtain and keep such control. It obliquely intimates that the plaintiff can fix prices on occasion even in the New York market, admitted to be the ruling one in the United States. It alleges that suits have been brought against the plaintiff by sugar planters, under the Sherman Act, for a total of near $200,000,000, and that after the exposure of the plaintiff's criminality in a suit by the United States that seems to have come to nothing, this law was passed. All of the foregoing, the main portion of the answer, is offered as ground for denying to the plaintiff any equitable relief.

In the alternative, if the plaintiff has a standing in

equity, the answer denies the plaintiff's explanation of the idleness of the Louisiana Refinery and avers that the statement that it buys less than half the Louisiana crop is deceptive, and that it buys seventy per cent. of the raw sugar sold to refiners. It alleges that the shipping of raw sugar north is due to artificial conditions created by the plaintiff and that but for them the whole would be 'handled locally.' It also alleges that the difference between the Louisiana and the New York price has been made less by the plaintiff since 1911, in order to prevent a repetition of the one successful combination made by the planters. Finally it alleges that the shipments to New York arrive when there is no sugar on hand or when the first sugar from Cuba is coming in, and enable the plaintiff to influence downward the price of the Cuban sugar that it needs. Most of the allegations of the bill are denied, and it is said that the rush to sell in November and December would have found a market but for the plaintiff's wrongful deeds.

The answer is signed by the Attorney General of the State; and if he were authorized to interpret the meaning of the other voice of the State heard in Act No. 10, would seem to import that the latter was a bill of pains and penalties disguised in general words. For the first division of the answer shows that the plaintiff is the only one to whom the act could apply and that the statute was passed in view of the plaintiff's conduct, to meet it. It is upon the assumption of the latter fact that the argument is pressed that the plaintiff has no standing in equity since it made the legislation necessary. If the connection were admitted it would be so much the worse for the constitutionality of the act. We deem it enough to say that neither that supposed connection nor the general intimations of the plaintiff's wickedness in the answer deprive it of its constitutional rights or prevent it from asserting them in the only practicable and adequate way.

The statute bristles with severities that touch the plaintiff alone, and raises many questions that would have to be answered before it could be sustained. We deem it sufficient to refer to those that were mentioned by the District Court; a classification which, if it does not confine itself to the American Sugar Refinery, at least is arbitrary beyond possible justice,—and a creation of presumptions and special powers against it that can have no foundation except the intent to destroy. As to the classification, if a powerful rival of the plaintiff should do no refining within the State it might systematically pay a less price for sugar in Louisiana than it paid elsewhere with none of the consequences attached to doing so in the plaintiff's case. So of anyone who purchases but does not refine. So of any concern that does not buy and refine more sugar 'than the aggregate of the sugar produced by it from cane grown and purchased by it' as easily might happen with a combination of planters such as the answer gives us to understand has been attempted heretofore.

As to the presumptions, of course the legislature may go a good way in raising one or in changing the burden of proof, but there are limits. It is "essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." *Mobile, Jackson & Kansas City R. R.* v. *Turnipseed*, 219 U. S. 35, 43. The presumption created here has no relation in experience to general facts. It has no foundation except with tacit reference to the plaintiff. But it is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime. If the statute had said what it was argued that it means, that the plaintiff's business was affected with a public interest by reason of the plaintiff's monopolizing it and that therefore the plaintiff should be *prima facie* presumed guilty upon proof

that it was carrying on business as it does, we suppose that no one would contend that the plaintiff was given the equal protection of the laws. We agree with the court below that the act must fall as a whole, as it falls in the sections without which there is no reason to suppose that it would have been passed.

*Decree affirmed.*