[L. A. No. 20332. In Bank. Feb. 3, 1948.]

W. L. SANDSTROM, Respondent, v. CALIFORNIA HORSE RACING BOARD et al., Appellants.

Fred N. Howser, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Appellants.

Joseph Scott, J. Howard Ziemann and Cuthbert J. Scott for Respondent.

SHENK, J.—The California Horse Racing Board appeals from a judgment in a mandamus proceeding the effect of which is to cancel its order suspending a trainer's license for six months. The judgment was entered upon the failure of the board to answer after its demurrer to the petition had been overruled.

W. L. Sandstrom sought the writ of mandate on November 18, 1946, in the Los Angeles Superior Court. He alleged

that he was a duly licensed trainer of race horses possessing license 111 for the year 1946; that on October 7, 1946, and pursuant to notice theretofore given, the California Horse Racing Board held a hearing in San Francisco at which he was present; that both documentary and oral evidence was introduced; that the board's decision ordered that his trainer's license be suspended for six months from and after August 12, 1946, for violating rule 313 of the board because he was the trainer of the horse Cover Up, and an analysis of a sample of the urine of the horse taken after running in a race at Del Mar Race Track, San Diego County, on August 12, 1946, showed the presence of a caffeine type alkaloid; that rule 313 was unconstitutional because it was arbitrary, unreasonable and capricious in that it assumed to make the trainer the absolute insurer of the condition of horses entered in a race regardless of the acts of third persons, thereby making conclusive that which has not been so declared by the Legislature in sections 1837 and 1978 of the Code of Civil Procedure; and that there was no substantial evidence, or any evidence, to support the findings of the board that he administered the stimulant or had knowledge thereof. As a return to the alternative writ the board interposed a general demurrer to the petition. A transcript of the proceedings had before the board was filed. (See *Dare* v. *Board of Medical Examiners*, 21 Cal.2d 790 [136 P.2d 304].) The demurrer was overruled, the board failed to answer and judgment was entered ordering that the suspension of Sandstrom be cancelled. On the appeal the board again attacks the sufficiency of the petition to state facts entitling Sandstrom to any relief.

The propriety of mandamus as the appropriate remedy is established (*Carroll* v. *California Horse Racing Board*, 16 Cal.2d 164 [105 P.2d 110]).

In this state supervision over horse races upon the results of which wagering is permitted is vested in the California Horse Racing Board (Bus. & Prof. Code, § 19420). A system of licensing is provided for and all licenses are subject to suspension or revocation for noncompliance with any condition of the license, for the violation of any law, or of any rule or regulation of the board (Bus. & Prof. Code, §§ 19460, 19461). A trainer's license may not be revoked without just cause (Bus. & Prof. Code, § 19513; *Carroll* v. *California Horse Racing Board, supra,* 16 Cal.2d 164). ''The

board may prescribe rules, regulations and conditions consistent with the provisions of this chapter [Horse Racing] under which all horse races, upon the results of which there is wagering, shall be conducted in this State." (Bus. & Prof. Code, § 19561.)

Pursuant to this authority the California Horse Racing Board adopted rules relating to trainers, their duties and responsibilities. By rule 282 (tit. 4, Cal. Adm. Code, § 1887) it is provided: "Trainers are responsible for the condition of horses in their care and are presumed to know these rules." Rule 285 (tit. 4, Cal. Adm. Code, § 1890) provides: "A trainer shall be responsible for the timely attendance of his horse or horses at the paddock and he shall attend his horse in the paddock and shall be present to supervise the saddling. In case of emergency, he may, with the permission of the Paddock Judge, appoint another licensed trainer as his deputy in these matters." Rule 286 (tit. 4, Cal. Adm. Code, § 1891) provides: "In the event any licensed trainer is at any time prevented from performing his duties by illness or other sufficient cause, and shall be absent from the track where employed, the Stewards of the Meeting shall be immediately notified of such fact, and at the same time a duly licensed substitute trainer, acceptable to the Stewards, shall be appointed. The Board of Stewards shall be advised immediately when the regular trainer resumes his duties." Rule 313 (tit. 4, Cal. Adm. Code, § 1930) provides:

"Equipment as prescribed by the California Horse Racing Board for the administration of saliva, or urine, or other tests, shall be required at all meetings. All horses will be subject to these tests, or any other tests prescribed by the Board, or ordered by the Stewards, either before, or after the race, or both.

"The Trainer shall be the absolute insurer of and responsible for the condition of the horses entered in a race, regardless of the acts of third parties. Should the chemical, or other analysis of saliva, or urine samples, or other tests, prove positive, showing the presence of any narcotic, stimulant, chemical, or drug of any kind or description, the Trainer of the horse may be suspended or ruled off, and in addition, the Foreman in charge of the horse, the Groom signing the Pre-Race Examination Slip and Paddock Certificate, and any other person shown to have had the care,

or attendance, of the horse may be suspended or ruled off, in the discretion of the Board.''

The import of this rule is to impose strict responsibility upon the trainer for the condition of the horse. The language of the rule can admit of no other conclusion. Two factual elements must exist to bring the rule into operation; first, the licensee must be the trainer of the horse, and secondly, the analysis must show the presence of a stimulating or depressive drug or chemical. Sandstrom's status as trainer of Cover Up has never been disputed, and the petition for the writ of mandate did not attack the finding of the board that the analysis showed the presence of a caffeine type alkaloid. In fact at the hearing before the board, Sandstrom stipulated that he was both the trainer and owner of Cover Up on August 12, 1946, and expressed satisfaction with the accuracy of the laboratory tests. The question is whether strict liability for the condition of a race horse can be constitutionally imposed on the trainer of the horse.

The general rule is well stated in *City of Chicago* v. *Sturges,* 222 U.S. 313, 322 [32 S.Ct. 92, 56 L.Ed. 215] :

''It is a general principle of our law that there is no individual liability for an act which ordinary human care and foresight could not guard against. It is also a general principle of the same law that a loss from any cause purely accidental must rest where it chances to fall. But behind and above these general principles which the law recognizes as ordinarily prevailing, there lies the legislative power, which, in the absence of organic restraint, may, for the general welfare of society, impose obligations and responsibilities otherwise non-existent.

''Primarily, government exists for the maintenance of social order. Hence it is that the obligation of the government to protect life, liberty and property against the conduct of the indifferent, the careless and the evil-minded may be regarded as laying at the very foundation of the social compact. A recognition of this supreme obligation is found in those exertions of the legislative power which have as an end the preservation of social order and the protection of the welfare of the public and of the individual. If such legislation be reasonably adapted to the end in view, affords a hearing before judgment, and is not forbidden by some other affirmative provisions of constitutional law, it is not to be regarded as denying due process of law under the provisions of the Fourteenth Amendment.''

■ That the imposition of strict liability whether by statute or judicial decision does not of itself contravene the due process clauses of the federal or state Constitutions may not be disputed. Approval of such liability may be found in *St. Louis & S. F. Ry. Co.* v. *Mathews,* 165 U.S. 1 [17 S.Ct. 243, 41 L.Ed. 611]—railroad liability for fires; *Jones* v. *Brim,* 165 U.S. 180 [17 S.Ct. 282, 41 L.Ed. 677]—liability for destruction of banks of highway when driving livestock over public highways; *Chicago, R. I. & P. R. Co.* v. *Zernecke,* 183 U.S. 582 [22 S.Ct. 229, 46 L.Ed. 339]—railroad's liability for injury to passengers; *City of Chicago* v. *Sturges, supra* (222 U.S. 313), Pol. Code, § 4452; *Agudo* v. *County of Monterey,* 13 Cal.2d 285 [89 P.2d 400] ; *Bank of California* v. *Shaber,* 55 Cal. 322—liability for damage by mobs and riots; *Colton* v. *Onderdonk,* 69 Cal. 155 [10 P. 395, 58 Am.St.Rep. 556]—blasting; *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686 . [151 P. 398]—workmen's compensation; 1 Deering's Gen. Laws, Act 384a, § 1 (Stats. 1931, p. 1095) ; *Goldberg* v. *Rabuchin,* 65 Cal.App.2d 111 [149 P.2d 861]—*scienter* eliminated as condition of liability for injury by a dog; 43 American Jurisprudence 113, section 309—public official's liability for safekeeping of public funds (Gov. Code, § 16508) ; Restatement of Torts, section 504 et seq.,—possession of animals; Restatement of Torts, section 519 et seq.,—ultrahazardous activities; *Wolfe* v. *Great Atlantic & Pacific Tea Co.,* 143 Ohio St. 643 [56 N.E.2d 230]—unwholesome food. See also *Green* v. *General Petroleum Corp.,* 205 Cal. 328 [270 P. 952, 60 A.L.R. 475] (oil gusher) ; and *In re Marley,* 29 Cal. 2d 525 [175 P.2d 832] (criminal liability for short weight).

■ The state, in the exercise of its police power, may regulate public race tracks and places of public amusement (*Greenberg* v. *Western Turf Association,* 148 Cal. 126 [82 P. 684, 113 Am.St.Rep. 216], affirmed 204 U.S. 359 [27 S.Ct. 384, 51 L.Ed. 520]) and may absolutely prohibit wagering on the results of horse racing (Pen. Code, § 337a; *In re Walker,* 11 Cal.2d 464 [80 P.2d 990, 117 A.L.R. 825] ; *Matter of Brown,* 156 Cal. 632 [105 P. 739] ; *People* v. *Torrey,* 16 Cal.App. 470, 472 [60 P.2d 900] ; see also *State Racing Commission* v. *Latonia Agricultural Assn.,* 136 Ky. 173 [123 S.W. 681, 25 L.R.A. N.S. 905]).

■ When the state sees fit to regulate upon a matter which is within its police power, its authority over the subject is plenary and can be reviewed by the courts only to

the extent of determining whether the regulation is reasonable. (*Wholesale Tobacco Dealers Bureau* v. *National Candy & T. Co.*, 11 Cal.2d 634 [82 P.2d 3, 118 A.L.R. 486]; *State Savings etc. Bank* v. *Anderson*, 165 Cal. 437 [132 P. 755, L.R.A. 1915E 65].) Whether the regulation is reasonable depends on the character or nature of the condition to be met or overcome. (*Whyte* v. *City of Sacramento*, 65 Cal.App. 534, 549 [224 P. 1008].)

 Rule 313 is designed to afford the wagering public a maximum of protection against race horses being stimulated or depressed by making the trainer the insurer of the horse's condition. That the wagering public merits such protection is evident from the magnitude of its patronage. Revenue to the California Horse Racing Board at 4 per cent of the pari-mutuel wagers amounted to $16,563,763.36 for the fiscal year 1945-1946. (State of California Budget for the Fiscal Year 1947-1948, p. 811.) Should responsibility be imposed only for actual guilty participation or culpable negligence, as petitioner contends, there would exist a possible field of activity beyond the affirmative protection thereby afforded to patrons of the pari-mutuel system. Remedial action subsequent to the pay-off at the pari-mutuel meetings may in some instances be effective as between competitors for the purse money. Such action may constitute a delay in payment of the prize money until the determination of the saliva, urine or other test. In fact rule 316 of the board (tit. 4, Cal. Adm. Code, § 1933) so provides. The recognized interest of the wagering patrons is sought to be safeguarded by rule 313. In most instances the very existence of the condemned activities creates a nonremedial situation. Detection of the condition may not be possible until long after the race has been run and the pari-mutuel winners paid off. The closer the supervision to which the trainer is held, the more difficult it becomes for anyone to administer a drug or chemical to the horse. The exaction of the ultimate in that regard is justified by the peril to be avoided. "Legislation for regulatory purposes, which dispenses with the condition of awareness of wrongdoing and places the burden of acting at his peril on a person otherwise innocent 'but standing in personal relation to a public danger' . . . is a traditional means of regulation." (*People* v. *Scott*, 24 Cal.2d 774, 782 [151 P.2d 517].)

 Rule 313 may not be deemed to establish a conclusive presumption to the effect that evidence of the presence

of a drug in a horse is proof that the trainer drugged the horse. By express language the rule imposes strict liability for the condition of the horse. Fault in the sense of actual administration of the drug or negligent care by the trainer is neither the basis nor an element of liability. It may not be injected into the case by way of subtle hypothesis. Whether the trainer drugged the horse or knew that it was drugged, or was negligent in not properly seeing that the horse was not drugged are not elements of liability. Since rule 313 may not be considered as establishing a presumption it is not within the scope of the limitations imposed either by sections 1837 and 1978, Code of Civil Procedure, or by *Schlesinger* v. *Wisconsin,* 270 U.S. 230 [46 S.Ct. 260, 70 L.Ed. 557]; *Heiner* v. *Donnan,* 285 U.S. 312 [52 S.Ct. 358, 76 L.Ed. 772]; or *Tot* v. *United States,* 319 U.S. 463 [63 S.Ct. 1241, 87 L. Ed. 1519].

On the other hand the liability imposed upon "the Foreman in charge of the horse, the Groom signing the Pre-Race Examination Slip and Paddock Certificate, and any other person shown to have had the care, or attendance, of the horse" is not the strict liability imposed upon the trainer, but is necessarily limited to guilty conduct or culpable negligence. That this is so stems from the wording of rule 313 and the consideration that strict liability may not be imposed by inference, or indiscriminately, or upon persons having but a minor part in an activity.

Our attention has been directed to three cases in which the validity of the suspension of a trainer's license was involved.

In *Smith* v. *Cole* (May 17, 1946), 270 App.Div. 675 [62 N.Y.S.2d 226], the suspension was upheld as being "for cause" where the trainer was not present when a 2.6 per cent solution of ephedrine was sprayed into the nasal passages of the horse, but "there was evidence from which his responsibility for the treatment could be found to be established."

Next is *Mahoney* v. *Byers* (July 23, 1946), —— Md. —— [48 A.2d 600]. There the Maryland Racing Commission suspended for one year the license of J. D. Byers, trainer of the horse Cosey, because benzedrine was found in the saliva sample taken after the horse had won a steeplechase. This action was pursuant to sections (a) and (d) of rule 146 of the Maryland Racing Commission which provided:

"(a) No person shall administer, or knowingly or carelessly permit to be administered to any horse entered for a

race, any drug in any way within forty-eight (48) hours before the time of the race.

"(d) If the Commission finds from analysis of the saliva or urine, or blood taken from a horse on the day of a race in which the horse ran, or from other competent evidence, that any drug has been administered to the horse within forty-eight (48) hours before the race, the trainer shall be subject to the penalties prescribed in sub-section (e) hereof, whether or not he administered the drug, or knowingly or carelessly permitted it to be administered. The fact that the analysis shows the presence of a drug shall be conclusive evidence either that there was knowledge of the fact on the part of the trainer or that he was guilty of carelessness in permitting it to be administered."

The suspension was cancelled and the license ordered restored by the superior court. In affirming the order, the Court of Appeals held that the rule substituted an irrebuttable presumption for facts necessary to find the trainer guilty; that evidence may not be made conclusive which was not so of its own nature and inherent force, and thus preclude a party from showing the truth; and that a law which prevents one from making a defense to a charge brought against him by substituting an irrebuttable presumption for facts is arbitrary, capricious and unconstitutional.

The third case is *State* v. *Baldwin* (on rehearing June 27, 1947), —— Fla. —— [31 So.2d 627]. There, in an original proceeding in mandate, the Florida Supreme Court considered the validity of the racing board's action in suspending for 12 months the license of Joseph J. Paoli as a trainer. Paoli was the trainer of the horse James Acker when it won the second race at Sunshine Park on January 30, 1947. Benzedrine was found in the urine sample taken immediately after the race. The commission had purported to act under its rule 117, which provided:

"117. The trainer shall be the absolute insurer of and responsible for the condition of the horses entered in a race regardless of the acts of a third party. Should the chemical or other analysis or saliva or urine samples or other tests prove positive, showing the presence of any narcotic, stimulant, chemical or drug of any kind or description, the trainer of the horse may be suspended or ruled off, and in addition, the foreman in charge of the horse, the groom and any other person shown to have had the care or attendance of the horse may be suspended or ruled off in the discretion of the Com-

mission, and for a like second or subsequent finding shall be ruled off.''

Also pertinent was rule 109 which provided:

''No person shall administer, or permit to be administered in any manner whatsoever, internally or externally, to any horse entered or to be entered in a race, any stimulant, depressant, hypnotic or narcotic drug, of any kind or description, prior to a race or workout.''

The court held that reading rule 117 with rule 109 readily showed that rule 109 prohibited certain acts while rule 117 purported to specify the proof required to establish the fact that the prescribed acts (rule 109) had been committed by the trainer; that in effect rule 117 provided that proof of the fact that a horse entered in a race had been administered a drug should constitute irrebuttable evidence that the trainer violated rule 109, i. e., that *he* administered the drug; and that rule 117 violated both the federal and Florida due process constitutional clauses because liability might not be imposed on an assumption of an essential fact, thus denying an opportunity to interpose reasonable and legitimate defenses.

As applied to the present controversy, the foregoing three cases are not controlling. While the suspension was upheld in *Smith* v. *Cole, supra* (270 App.Div. 675 [62 N.Y.S.2d 226]), there was evidence that the trainer was knowingly responsible for the treatment. There was no such evidence here. The rule considered in *Mahoney* v. *Byers, supra* (—— Md. ——, [48 A.2d 600]), substituted an irrebuttable presumption for an essential fact. Thus evidence was made conclusive which was not so of its own nature and inherent force. In the case at bar liability is not predicated on administration of the drug nor on the failure to exercise due care, and the presence or absence thereof would neither add nor detract. *State* v. *Baldwin, supra* (—— Fla. —— [31 So.2d 627]), would at first appear persuasive since rule 117, there considered, somewhat parallels rule 313 now under attack. But that case did not consider the power of a state to impose strict liability, the existence of which is the fundamental basis of our determination. Also, it would appear that the decision in the Baldwin case was influenced decisively by analogy to *Mahoney* v. *Byers, supra* (—— Md. —— [48 A. 2d 600]), where the mechanics rested in the employment of a presumption as conclusive evidence.

From the foregoing considerations it follows that it is not unreasonable, arbitrary or capricious to provide that the trainer guarantee the condition of a horse running in a race upon the results of which there is wagering.

As an additional ground for the issuance of the writ Sandstrom alleged that there was no evidence to support the finding of the board that he administered the stimulant or had knowledge thereof. No such finding was made. Nor would such a finding be essential to the imposition of liability by way of suspension of a trainer's license for violation of rule 313. That this is so is obvious from a conclusion upholding the imposition of strict liability as a proper exercise of the police power. The board found that Sandstrom was the trainer of Cover Up and that an analysis of the urine sample taken after the race showed the presence of a caffeine type alkaloid. Those findings, supported by undisputed evidence, brought Sandstrom within the operative scope of rule 313.

On appeal Sandstrom has advanced an additional ground for invalidating his suspension. He asserts that rule 313 is not a legitimate exercise of delegated authority, that is, that insofar as that rule is based on the statutory grant of power to the board to prescribe rules, regulations and conditions under which horse racing is conducted (Bus. & Prof. Code, § 19561), it is an unconstitutional delegation of legislative authority.

The Constitution of the United States has no voice in determining whether power conferred on a board or commission set up by a state statute involves an unlawful delegation of legislative power. Objections that might be worthy of consideration if the court were dealing with an act of Congress are removed. (*Highland Farms Dairy* v. *Agnew,* 300 U.S. 608 [57 S.Ct. 549, 81 L.Ed. 835] ; 42 Am.Jur. p. 335.) Under the doctrine of the separation of the powers of government the lawmaking function is assigned to the Legislature (Cal. Const., art. IV, § 1.) It is a cardinal rule that except when authorized by the Constitution the Legislature cannot delegate the power to legislate to any other authority or body. (Cal. Const., art. III, § 1; *Schaezlein* v. *Cabaniss,* 135 Cal. 466 [67 P. 755, 87 Am.St.Rep. 122, 56 L.R.A. 733] ; 11 Am.Jur. § 214, p. 921.)

In 1933, the Legislature passed the Horse Racing Act (Stats. 1933, p. 2046; Deering's Gen. Laws, 1933 Supp., Act 3420) which created the California Horse Racing Board and

granted it "full power to prescribe rules, regulations and conditions" governing the conduct of horse races where there is wagering. By section 19 it was provided that the act should not become effective until the people should ratify a constitutional amendment approving it. At the election held June 27, 1933, section 25a, article IV of the Constitution was adopted. It provides:

"Sec. 25a. The Legislature may provide for the regulation of horse races and horse race meetings and wagering on the results thereof. The provisions of an act entitled 'An act to provide for the regulation and licensing of horse racing, horse racing meetings, and the wagering on the results thereof; to create the California Horse Racing Board for the regulation, licensing and supervision of said horse racing and wagering thereon; to provide penalties for the violation of the provisions of this act, and to provide that this act shall take effect upon the adoption of a constitutional amendment ratifying its provisions,' are hereby confirmed, ratified, and declared to be fully and completely effective; provided, that said act may at any time be amended or repealed by the Legislature."

The effect of this constitutional amendment as here material is that it expressly "confirmed, ratified, and declared to be fully and completely effective" the legislative grant of power to the California Horse Racing Board. That the Constitution may permit the Legislature to delegate powers may not be doubted. The Constitution may even authorize the Legislature to confer additional powers which are cognate and germane to its purposes upon a constitutional board or commission, and may further provide that such powers are unlimited by any other provisions of the Constitution. (See Const., art. XII, § 22; *Pacific Telephone etc. Co.* v. *Eshleman,* 166 Cal. 640 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A. N.S. 652].) The continuance of the grant of power into section 19561, Business and Professions Code, did not affect its status as previously ratified and confirmed. (See Bus. & Prof. Code, § 2.) The delegation of authority here considered has constitutional support.

The judgment is reversed.

Gibson, C. J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I concur. While at first thought the rule which we uphold appears to be a harsh one I am persuaded

that upon reflection its seeming harshness largely disappears and its justice becomes manifest. The effect of the decision simply is that a trainer is held penally responsible on his warranty that a horse entered by him in a race has not been "doped."

That the public are entitled to protection against the practice of drugging race horses is not disputed; that the trainer who has charge of a horse, who undertakes to condition it for a race and who actually enters it in the race and permits it to compete shall be charged with absolute responsibility for its condition seems within the bounds of moral reason and legislative power. Contrary to the suggestion which has been made in argument the trainer is not defenselessly liable to punishment for the act of another person; he is liable only for his own act or omission; i. e., causing or permitting a horse warranted by him to be free from drugs to participate in a race while drugged.

The trainer can protect himself by protecting the horse and by checking its condition at the last reasonably possible moment before the race. If he finds that despite his earlier care the horse has been drugged he must, of course, withdraw it from the contest; from the time of the last condition check until the race it is not unreasonable that the trainer shall be held to the responsibility of either so guarding the animal as to preclude its being drugged or of withdrawing it from the race.

EDMONDS, J.—In my opinion, there is no sound legal basis for the decision upholding rule 313 of the Horse Racing Board. All of the cases relied upon for that conclusion are based upon evidence tending to prove the connection of the defendant with the prohibited act. In each of them, the defendant was found guilty because of his own conduct, or that of his agent, or upon evidence tending to show his negligence. But the horse trainer may be held responsible for the acts of third persons over whom he had no control and against which he may have taken every precaution. The rule in effect declares, "No matter who drugged the horse, or under what circumstances it was done, the trainer must pay the penalty, with no right to show any facts negating his connection with the prohibited act."

Unquestionably, as stated in the opinion, "the recognized interest of the wagering patrons is sought to be safeguarded by Rule 313." But not everything done "in the interest of the

public'' is valid for that reason. (*McFarland* v. *American Sugar Ref. Co.*, 241 U.S. 79 [36 S.Ct. 498, 60 L.Ed. 899].) In cases of alleged violation of due process, it is the invasion of the right of the individual citizen which determines the validity or invalidity of a rule or a statute and not the rights of the public generally.

It may be conceded that Sandstrom's suspension is not upheld upon the ground of a conclusive presumption that he administered a narcotic or other stimulant. But for the same reason that such a presumption would be invalid, the rule, which ''operates to deny a fair opportunity'' to the trainer to show facts negating his responsibility, should likewise be held void. The situation here is not unlike that in *Manley* v. *Georgia*, 279 U.S. 1, 7 [49 S.Ct. 215, 73 L.Ed. 575], where, in reversing a judgment of conviction, the court said: ''The proof which makes a prima facie case points to no specific transaction, matter or thing as the cause . . . or to any act or omission of the accused tending to show his responsibility.''

For these reasons, I would affirm the judgment.

CARTER, J.—I dissent.

The majority opinion sustains as valid a rule of the California Horse Racing Board which imposes liability without culpability—guilt without fault or knowledge that a wrong had been perpetrated or that the rule had been violated. Under this rule an innocent person may be condemned and punished without evidence that he did, or intended to do, or permitted to be done, any wrong whatsoever. In fact, this result could be obtained even if it were conclusively shown that such innocent person did everything possible to prevent the violation of such rule or was overpowered by a wrongdoer and rendered helpless while the unlawful act was being consummated. The exercise of vigilance, diligence, care, precaution and fidelity to duty honestly and faithfully performed is of no avail. The suspended axe falls and the innocent victim is decapitated. ''Oh! [justice], what crimes are committed in thy name.''

In overruling the demurrer interposed by the California Horse Racing Board to the petitioner's petition in the trial court, the learned trial judge made the following comment: ''Respondents, by this Rule 313, and through counsel on the hearing herein, contend that the Board has the absolute right to suspend a trainer's license upon the proof of the presence of the narcotic in the horse after a race, on the basis of the

Rule which proclaims the trainer handling that horse as the 'absolute insurer . . . of the condition of the horse . . . regardless of the acts of third parties.'

"This Rule as written deprives the licensee in question of any possible defense to an attempt or threat of the Board to suspend his license once the presence of the proscribed narcotic was established. To deprive the trainer of his license under such circumstances would not be founded upon 'just cause,' and for that reason, the Rule as construed and applied by the Board in this case is arbitrary, unreasonable and capricious, and inconsistent with the provisions of the chapter on Horse Racing, particularly sections 19512 and 19513. That portion reading 'shall be the absolute insurer regardless of the acts of third parties,' and basis for suspension is inconsistent with the authority of the Board to make reasonable rules and to limit suspension orders to cases where just cause is established."

I am in full accord with the foregoing pronouncement. In my opinion rule 313, as here applied, violates every precept of justice as established by the Constitution and laws of the United States and this state. It is unconstitutional and out of harmony with the American system of justice, and may appropriately be labeled as "un-American." It cannot stand in the face of the long line of decisions of the Supreme Court of the United States which denounce such strictures on justice as a violation of the due process provisions of the Fifth and Fourteenth Amendments to the Constitution of the United States. (*Tot* v. *United States*, 319 U.S. 463 [63 S.Ct. 1241, 87 L.Ed. 1519]; *Mobile, J. & K. C. R. Co.* v. *Turnipseed*, 219 U.S. 35 [31 S.Ct. 136, 55 L.Ed. 78]; *Bailey* v. *Alabama*, 219 U.S. 219 [31 S.Ct. 145, 55 L.Ed. 191]; *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U.S. 61 [31 S.Ct. 337, 55 L.Ed. 369]; *Luria* v. *United States*, 231 U.S. 9 [34 S.Ct. 10, 58 L.Ed. 101]; *McFarland* v. *American Sugar Ref. Co.*, 241 U.S. 79 [36 S.Ct. 498, 60 L.Ed. 899]; *Manley* v. *Georgia*, 279 U.S. 1 [49 S.Ct. 215, 73 L.Ed. 575]; *Western & Atlantic R. R. Co.* v. *Henderson*, 279 U.S. 639 [49 S.Ct. 445, 73 L.Ed. 884]; *Morrison* v. *California*, 291 U.S. 82 [54 S.Ct. 281, 78 L.Ed. 664].) But the majority argues that since the rule in question may not be considered as establishing a presumption it does not come within the rule announced in the above cited cases. Such argument is fallacious. No rational mind can deny that rule 313 goes farther than any of the statutes involved in the above cited cases in depriving the complaining party of due process

of law. The presumption involved in each of the above cited cases was rebuttable, but it placed upon the defendant the burden of disproving the fact presumed. Can it be said that if the statutes in those cases had imposed liability without fault, that such statutes would not have been stricken down as violative of the due process provisions? I do not think that the majority of this court will so contend. In every case where a statute imposing absolute liability was sustained, such liability was predicated upon proof that the party held liable was in control of the agency which caused the injury from which the damage resulted. The argument on behalf of the defendant in those cases was not that the injury or damage did not result from its operation, but that there was no proof of negligent conduct on its part. This is quite a different matter than holding a defendant liable without proof that it set in motion the agency which caused the injury or damage.

The majority opinion states: "Rule 313 may not be deemed to establish a conclusive presumption to the effect that evidence of the presence of a drug in a horse is proof that the trainer drugged the horse. By express language the rule imposes strict liability for the condition of the horse. Fault in the sense of actual administration of the drug or negligent care by the trainer is neither the basis nor an element of liability. It may not be injected into the case by way of subtle hypothesis. Whether the trainer drugged the horse or knew that it was drugged, or was negligent in not properly seeing that the horse was not drugged are not elements of liability. Since Rule 313 may not be considered as establishing a presumption it is not within the scope of the limitations imposed either by sections 1837 and 1978, Code of Civil Procedure, or by *Schlesinger* v. *Wisconsin,* 270 U.S. 230 [46 S.Ct. 260, 70 L.Ed. 557] ; *Heiner* v. *Donnan,* 285 U.S. 312 [52 S.Ct. 358, 76 L.Ed. 772] ; or *Tot* v. *United States,* 319 U.S. 463 [63 S.Ct. 1241, 87 L.Ed. 1519]."

The foregoing argument is based upon specious reasoning. It is a veiled denial of the obvious—a smoke screen which attempts to obscure the patent objective of the rule. Let us analyze this argument. It states: "Rule 313 may not be deemed to establish a conclusive presumption to the effect that evidence of the presence of a drug in a horse is proof that the trainer drugged the horse." But what does rule 313 say? "The trainer shall be the absolute insurer of and responsible for the condition of the horses entered in a race, regardless of

the acts of third parties." Does this rule not say in effect: "If a horse is found to have been drugged it will be conclusively presumed that the trainer was responsible therefor?" Certainly there can be no difference in legal effect between absolute liability and a conclusive presumption of liability. The majority opinion calls it "strict responsibility." With this I agree. But this does not render it immune to the due process provisions of the Constitution. Certainly, if a statute which purports to create liability by mere fiat is violative of the due process provisions, a rule of an administrative agency which comes within that category, would likewise fall in the face of those provisions.

It has been said that governments are instituted for the purpose of protecting and advancing the rights and ideals of the people, and that ours is a government "of the people— by the people—for the people." Such concepts contemplate protection of individual and personal rights to the extent at least that all persons under the protecting arm of our government may have the opportunity to enjoy life, liberty and the pursuit of happiness. As a fortress for the protection of these rights our judicial system was established. Out of this system has developed what is commonly termed the American system of justice which contemplates that before a person can be deprived of life, liberty or property he must be accorded due process of law. While the term due process of law has been the subject of various interpretations by the judicial tribunals of this country, I think it can be said that there has been no departure from the basic concept that in order to fulfil the requirements of the due process provisions there must be a charge sufficient to inform the person against whom it is directed, of its nature; such charge must be presented to a legally constituted tribunal having jurisdiction to determine the issues raised thereby; that notice of such charge must be given to the person against whom it is directed and a hearing had, at which evidence must be produced sufficient to sustain the charge. It may be conceded that all of the requirements of due process except the last mentioned (evidence to sustain the charge) have been met in this case. But instead of producing evidence the state relies upon rule 313 adopted and promulgated by the California State Horse Racing Board which purports to substitute for evidence of guilt a mere fiat, namely, that the administering of a drug to a horse entered in a race is chargeable to the trainer without regard to his knowledge of the fact or ability to prevent it. It is my posi-

tion that the application of such a rule in the case at bar constituted a denial to petitioner of due process of law guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States.

This position finds ample support in the authorities. In *Manley* v. *Georgia, supra,* at page 6, the court said: "A statute creating a presumption that is arbitrary or that operates to deny a fair opportunity to repel it violates the due process clause of the Fourteenth Amendment. *Bailey* v. *Alabama,* 219 U.S. 219, 233 [31 S.Ct. 145, 55 L.Ed. 191], et seq. Mere legislative fiat may not take the place of fact in the determination of issues involving life, liberty or property. '. . . it is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime.' *McFarland* v. *American Sugar [Ref.] Co.,* 241 U.S. 79, 86 [36 S.Ct. 498, 60 L.Ed. 899]." This holding was reaffirmed in *Tot* v. *United States, supra,* where the Court said at pages 466 and 467: "An indictment charges the defendant with action or failure to act contrary to the law's command. It does not constitute proof of the commission of the offense. *Proof of some sort on the part of the prosecutor is requisite to a finding of guilt;* it may consist of testimony of those who witnessed the defendant's conduct. Although the Government may be unable to produce testimony of eye witnesses to the conduct on which guilt depends, this does not mean that it cannot produce proof sufficient to support a verdict. The jury is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference. In many circumstances courts hold that proof of the first fact furnishes a basis for inference of the existence of the second.

"The rules of evidence, however, are established not alone by the courts but by the legislature. The Congress has power to prescribe what evidence is to be received in the courts of the United States. The section under consideration is such legislation. *But the due process clauses of the Fifth and Fourteenth Amendments set limits upon the power of Congress or that of a state legislature to make the proof of one fact or group of facts evidence of the existence of the ultimate fact on which guilt is predicated.* The question is whether, in this instance, the Act transgresses those limits.

"The Government seems to argue that there are two alternative tests of the validity of a presumption created by statute. The first is that there be a rational connection between the

facts proved and the fact presumed; the second that of comparative convenience of producing evidence of the ultimate fact. We are of opinion that these are not independent tests but that the first is controlling and the second but a corollary.'' [Emphasis added.]

And again at page 469: ''Nor can the fact that the defendant, has the better means of information, standing alone, justify the creation of such a presumption. In every criminal case the defendant has at least an equal familiarity with the facts and in most a greater familiarity with them than the prosecution. It might, therefore, be argued that to place upon all defendants in criminal cases the burden of going forward with the evidence would be proper. But the argument proves too much. If it were sound, the legislature might validly command that the finding of an indictment, or mere proof of the identity of the accused, should create a presumption of the existence of all the facts essential to guilt. This is not permissible.

''Whether the statute in question be treated as expressing the normal balance of probability, or as laying down a rule of comparative convenience in the production of evidence, it leaves the jury free to act on the presumption alone once the specified facts are proved, unless the defendant comes forward with opposing evidence. And this we think enough to vitiate the statutory provision.''

The majority opinion argues: ''That the imposition of strict liability whether by statute or judicial decision does not of itself contravene the due process clauses of the federal or state Constitutions may not be disputed.'' In support of this statement several cases are cited. An examination of these cases discloses that in none of them was a statute or rule involved which created absolute liability without proof that the defendant or his agent or employee was in control of the agency which caused the injury or damage, and none of the cases there cited involve a statute or rule of an administrative agency which purports to create liability without such proof.

The majority opinion also argues that: ''The state, in the exercise of its police power, may regulate public race tracks and places of public amusement.'' And that: ''When the state sees fit to regulate upon a matter which is within its police power, its authority over the subject is plenary and can be reviewed by the courts only to the extent of determining whether the regulation is reasonable.''

I do not disagree with the legal propositions above announced, but their applicability to the case at bar is rather obscure. There is no question but that the state may regulate and even prohibit gambling and this feature of the horse racing enterprise clearly comes within the purview of the police power of the state. However, when it comes to the matter of training horses and racing them independent of the gambling feature of the enterprise, I doubt if the state has any power to place restrictions thereon. It is obvious that only because people desire to wager upon the outcome of horse races the state has any power to control the handling or treatment of horses so long as such treatment is humane. But conceding that the entire horse racing enterprise because of its gambling features is now within the purview of the police power of the state, it does not follow that the state may violate the due process provisions of the federal and state Constitutions under the guise of exercising its police power. It may be said that all criminal cases come within the purview of the police power. Yet it is well settled that: "A law which would practically shut out the evidence for the accused and thus deny him the opportunity for a trial would substantially deprive him of due process of law, and be invalid; a law which makes an act prima facie evidence of a crime over which the party charged had no control, and with which he had no connection, is clearly invalid. Similarly, an ordinance which throws upon the defendant the burden of proving his innocence of a crime is void.

"It is also well settled that the legislature may not arbitrarily create a conclusive presumption of guilt against the accused, as to any element of the crime charged, by giving artificial and evidential force to certain facts which otherwise would be wholly irrelevant and inconclusive." (20 Am.Jur. 42.)

The majority opinion argues that: "Rule 313 is designed to afford the wagering public a maximum of protection against race horses being stimulated or depressed by making the trainer the insurer of the horse's condition," and that "Should responsibility be imposed only for actual guilty participation or culpable negligence, as petitioner contends, there would exist a possible field of activity beyond the affirmative protection thereby afforded to patrons of the pari-mutuel system. ... *The closer the supervision to which the trainer is held, the more difficult it becomes for anyone to administer a drug or*

*chemical to the horse. The exaction of the ultimate in that re-*
*gard is justified by the peril to be avoided."* [Emphasis added.]

In substance, this same argument may be made in support
of every other unreasonable, arbitrary and capricious statute
or rule which was ever enacted or adopted. It is a matter of
weighing expediency against injustice, or, putting it in another
way, does the benefit to that portion of the public who desire
to engage in the "sport of kings" outweigh the injustice to
an individual whose right to earn his livelihood in his chosen
profession is lost because it is impossible for him to prevent
a violation of the rule? Having had some experience in the
care and training of horses (not of the racing type) I take
judicial notice of the fact that a trainer does not sleep with
his horse, nor is he with him during all his waking hours. I also
think it is reasonable to assume that notwithstanding the
utmost vigilance is practiced by the trainer, there is neverthe-
less a possibility that stealthy culprits may be able to admin-
ister a drug to a horse without the trainer's knowledge.
Whether the fact could be ascertained by the trainer before he
permitted the horse to enter the race, is problematical. The
opinion prepared by Mr. Justice Shenk states that: "Detec-
tion of the condition may not be possible until long after the
race has been run and the pari-mutuel winners paid off." But
in the concurring opinion of Mr. Justice Schauer he states
that: "The trainer can protect himself by protecting the
horse and by checking its condition at the last reasonably pos-
sible moment before the race. If he finds that despite his
earlier care the horse has been drugged he must, of course,
withdraw it from the contest; from the time of the last condi-
tion check until the race it is not unreasonable that the trainer
shall be held to the responsibility of either so guarding the
animal as to preclude its being drugged or of withdrawing it
from the race." As I have had no experience in the technic
of testing horses to determine whether or not they have been
drugged, and the record fails to disclose whether such a test
would be of any value if made before a horse was entered in
a race, I do not know which, if either, of the above quoted
statements is correct. It seems, however, that the test applied
in this case (urine) would probably not be possible to apply
before the horse was entered in the race. Moreover, it would
also seem that if any reliable test could be made before the
race, such test would be made under the supervision of the
racing board to protect the wagering public against fraud.
Be that as it may, such considerations are of little value in

testing the validity of rule 313 in the light of the requirements necessary to satisfy the due process provisions of the federal and state Constitutions. As hereinbefore stated, the rule establishes a conclusive presumption of guilt when a test discloses that a horse entered in a race has been drugged. Such a rule is far more unreasonable and arbitrary than any of the statutes creating rebuttable presumptions which were held invalid as violative of the due process provisions by the United States Supreme Court in the decisions hereinbefore cited.

As stated by Mr. Justice Cardozo in *Morrison* v. *California,* 291 U.S. 82 [54 S.Ct. 281, 78 L.Ed. 664] at 672 [78 L.Ed.] (invalidating section 9(a) of the California Alien Land Law) : "There is no practical necessity in such circumstances for shifting the burden of the defendant. Not only is there no necessity; there is only a faint promotion of procedural convenience. The triers of the facts will look upon the defendant sitting in the court room and will draw their own conclusions. If more than this is necessary, the People may call witnesses familiar with the characteristics of the race, who will state his racial origin. The only situation in which the shifting of the burden can be of any substantial profit to the state is where the defendant is of mixed blood, the white or the African so preponderating that there will be no external evidence of another. But in such circumstances the promotion of convenience from the point of view of the prosecution will be outweighed by the probability of injustice to the accused. One whose racial origins are so blended as to be not discoverable at sight will often be unaware of them. If he can state nothing but his ignorance, he has not sustained the burden of proving eligibility, and must stand condemned of crime."

The case of *Heiner* v. *Donnan,* 285 U.S. 312 [52 S.Ct. 358, 76 L.Ed. 772], involved the constitutionality of a provision of the death transfer tax law creating a conclusive presumption that gifts made within two years prior to the donor's death were made in contemplation of death. The government argued that under a prima facie presumption originally in force there had been a loss of revenue. The court says (at p. 780 [76 L.Ed.]) : "This is very near to saying that the individual, innocent of evasion, may be stripped of his constitutional rights in order to further a more thorough enforcement of the tax against the guilty, a new and startling doctrine, condemned by its mere statement and distinctly repudiated by this court in Schlesinger's case (270 U.S. 240) and Hoeper's case

(284 U.S. [206] 217 [52 S.Ct. 120, 76 L.Ed. 248]), cases involved similar situations.''

The majority opinion cites and analyzes, but refuses to follow, three recent cases decided by courts of other jurisdictions which have considered the problems here involved. *Smith* v. *Cole,* 270 App.Div. 675 [62 N.Y.S.2d 226]; *Mahoney* v. *Byers,* —— Md. —— [48 A.2d 600]; *State* v. *Baldwin,* —— Fla. —— [31 So.2d 627]. In my opinion the holding in all three of these cases is contrary to that of the majority of this court, and the attempt to distinguish them from the case at bar is based upon considerations more fanciful than real. The attempted distinction of the Mahoney case is based upon the fallacy that the Maryland rule substituted a rebuttable presumption for an essential fact. As I have heretofore pointed out, such a rule is much more favorable to the accused than the conclusive presumption provided for in rule 313 of the California Horse Racing Board. An attempt is made to distinguish the Baldwin case by the statement that the court which decided that case did not consider the power of a state to impose strict liability. Such a purported distinction is fallacious as the Supreme Court of Florida predicated its decision holding the rule invalid upon the obviously sound theory that the rule was so unreasonable, arbitrary and capricious that it constituted a violation of the due process provisions of the federal and state Constitutions. In my opinion the three cases above cited are in full accord with the settled rule announced by the Supreme Court of the United States in the cases which I have hereinbefore cited, and should be followed by this court.

Finally, it appears that the opinion prepared by Mr. Justice Shenk is rested upon the grounds that under the rule of the horse racing board the trainer is properly made an insurer against the doping of a horse and that there is no unlawful delegation of legislative power in conferring upon the board authority to make such a rule. Accepting those two propositions, there still remains the question of *whether the Legislature did delegate such power.* It is my opinion that the authority to adopt such a rule has not been granted by the Legislature to the board. The trainer, like others engaged in the activity of horse racing, must obtain a license from the board under the horse racing act. The act provides that such licenses *may not "be revoked* without *just cause.''* (Bus. & Prof. Code, § 19513.) It is true that the board is empowered to adopt rules and regulations for horse racing and a violation of a rule is

ground for suspension or revocation of a license, but if a license cannot be revoked except for "just cause" then no rule is valid, the violation of which can result in the loss of such license, which does not have a just cause or basis. Otherwise the requirement that there must be "just cause" for revocation of a license would be wholly thwarted. The board could make a rule that no bald headed man could hold a license as a trainer and then proceed to revoke a licensee's license because he lost his hair. Obviously the revocation of a license on that ground would not be for *"just cause."* The issue then becomes one to ascertain whether or not the rule in the instant case is founded upon *"just cause."*

A *"just cause"* is fair and reasonable cause. (*In re Municipal Garage in and for the City of Utica*, 141 Misc. 15 [252 N.Y.S. 18] ; *Quick* v. *Southern Churchman Co.*, 171 Va. 403 [199 S.E. 489].) For illustration, when an officer may not be removed except for "cause," the "Cause must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public." (46 C.J. 986.) (See, also, *Good* v. *Common Council*, 5 Cal.App. 265 [90 P. 44] ; McQuillan, Muni. Corps. [2nd ed.], § 579.) And there must be some element of wilfulness present—some fault or blame attributable to the officer. "It is frequently urged by certain opinions that the law 'providing for removal of unfaithful public officers was not designed as a pitfall into which an honest and sincere public officer might be plunged if he unintentionally erred in the discharge of his official duties . . . Wilful misconduct in office, wilful neglect of duty, are the vices for which the laws provide a summary removal.' 'The distinguishing characteristic of every official act must be genuine good faith,' and the 'law presumes that a public official thus conducts himself,' and the burden rests upon a complainant 'to show the contrary to be true, by a preponderance of the evidence.' " (McQuillan, Muni. Corps. [2nd ed.], § 579.) Likewise with a trainer, the *"just cause"* must have some relation to his qualifications for protecting the public interest.

Applying the foregoing to the rule making the trainer an insurer against the doping of the horse, we find the rule is sufficiently broad, as stated in the opinion prepared by Mr. Justice Shenk, to authorize the revocation or suspension of the trainer's license for the criminal act of a third person over whom he had no control. He may have been rendered

helpless by the third person to take any steps to prevent the doping. Although entirely faultless his license would be lost. It is difficult to understand how a trainer who is neither negligent nor intentionally a wrongdoer can be said to lack qualifications to be a trainer—to be a danger to the public—merely because he happened to be a trainer when a horse was doped through no fault of his or by some one over whom he had no control whatsoever. It must be admitted that the rule is a harsh one. Being such, it cannot qualify as *"just cause"*— the mandate laid down by the statute.

For the foregoing reasons the judgment should be affirmed.

Respondent's petition for a rehearing was denied March 1, 1948. Carter, J., voted for a rehearing.