[Civ. No. 20686. First Dist., Div. One. July 11, 1963.]

R. J. CARDINAL COMPANY, Plaintiff and Respondent, v. JESS M. RITCHIE et al., Defendants and Appellants.

128

Hannon & Hannon and Robert E. Hannon for Defendants and Appellants.

Broad, Busterud & Khourie and Michael M. Khourie for Plaintiff and Respondent.

SULLIVAN, J.—In this action brought by a third-party creditor beneficiary to recover for goods sold and labor and materials furnished, defendants Jess M. Ritchie (hereafter called Ritchie) and Pioneers, Inc. (hereafter called Pioneers) appeal from a judgment entered on a jury verdict against said defendants and in favor of plaintiff R. J. Cardinal Company (hereafter called Cardinal).

Plaintiff's second amended complaint on which the action proceeded to trial set forth four separately stated causes of action. The first three causes of action were brought against the defendant Battery AD-X2 Sales Corporation (hereafter called Sales) for the recovery of $14,612.92 on the bases of a book account and an account stated and in addition for the recovery of certain storage charges. The fourth cause of action was brought against Ritchie and Pioneers. It incorporated by reference the first three causes of action against Sales and sought recovery of the same amounts therein alleged on the basis of an oral promise to pay such indebtedness, allegedly made to Sales by Ritchie and Pioneers for the benefit of Cardinal.

We observe at the outset that the case proceeded to trial only against defendants Ritchie and Pioneers. The pretrial conference order states: "This is essentially an action by an alleged third party beneficiary. It is conceded that this is 'essentially so' because although the action nominally is

against (1) Battery AD-X2 Sales Corporation, Jess M. Ritchie, and Pioneers, Inc., a corporation, actually the defendant, Battery AD-X2 Sales Corporation, has no defense and concedes that it has none at the pre-trial conference. However, plaintiff's real cause, that is, the one in which it is actually interested, is against the other two defendants."[1] Hence at the conclusion of the trial, the verdict of the jury and the judgment entered thereon were confined to the two defendants above mentioned. The instant record does not contain the entry of the default of Sales or the default judgment against Sales. We therefore confine ourselves to the issues as framed by the answer of Ritchie and Pioneers and as delineated by the pretrial conference order, itself confined to such two defendants.[2]

Plaintiff's second amended complaint alleged among other things that one Edward N. Hermsen entered into a written franchise agreement with Pioneers; that said agreement was duly assigned to Sales; that said agreement provided that "in the event of a breach of contract by the franchisees" Sales and Hermsen, defendant Pioneers "had the right, upon sixty days written notice first given, to cancel and terminate the said franchise agreement"; that on or about February 28, 1959, defendants Pioneers and Ritchie "each orally agreed and promised" Sales, among other things, "to pay the above indebtedness to plaintiff in the amount of $14,612.92 within thirty days after February 28, 1959," in exchange for Sales' and Hermsen's promise and agreement to forego the 60-day cancellation notice and allow Pioneers and Ritchie to immediately take over the said exclusive sales and distribution rights granted by said franchise; that thereupon Sales and Hermsen, in reliance upon said promise and agreement, waived such right to said 60-day cancellation notice and returned to Pioneers and Ritchie the rights given by the written franchise agreement; and that there was no rescission or termination of such oral contract.

Defendants denied the material allegations of all four causes of action. In addition they alleged, among other things, that the oral (third-party beneficiary) agreement, if

---

[1] Plaintiff's pretrial statement stated that Sales "through its attorney, has stipulated that it has no defense and will, at the pretrial conference, stipulate to a default judgment against it, based upon the allegations of the second amended complaint."

[2] Nor are we concerned with other defendants sued by fictitious names.

any, was without consideration and had been terminated and rescinded.

Pioneers was the owner of a secret formula for a battery additive and was engaged in the business of manufacturing and marketing such product under the copyrighted and trademarked name of "Battery AD-X2." Ritchie was the president and director of Pioneers. He and his wife owned 87 per cent of its stock. On July 15, 1958, Pioneers entered into a written agreement with Hermsen entitled and hereafter referred to as "National Sales Agreement" by the terms of which Pioneers appointed Hermsen the exclusive national sales agent for Battery AD-X2 within the continental United States and its territories for a period of 10 years. On November 20, 1958, with the consent of Pioneers, Hermsen assigned the above agreement to Sales in consideration, among others, of the issuance to him of the capital stock of Sales. Hermsen became president of the new corporation.

As a result, Sales became the sole customer of Pioneers and in turn distributed the product involved to all of Pioneers' sales outlets throughout the designated territory. As part of this contract, Sales sold franchises for the additive in particular areas. Under these arrangements, the monetary consideration paid by the franchise purchaser included not only the franchise but promotional literature and a specified amount of the additive. Sales employed one Blackiston to handle all of its advertising for the battery additive, including the designing and printing of advertising and promotional material. In discharge of these duties Blackiston acting on behalf of Sales placed various orders for printing with the plaintiff. The orders were separately invoiced over the period November 28, 1958, to February 27, 1959. On the last date plaintiff sent to Sales a statement itemizing the various invoices and showing a total indebtedness due it from Sales in the sum of $14,612.94.

The contract of July 15, 1958, contained, among other things, provisions obligating Sales to purchase all of its requirements of the battery additive from Pioneers and specifying minimum monthly quotas of purchases. In addition it included the following so-called cancellation clause: "Failure by SALES to maintain the above specified monthly quotas shall be considered as just cause for Pioneers to either revise the terms of this agreement or terminate it at their option upon 60 days written notice to SALES. This agreement may also be terminated by the parties by mutual consent or for cause."

Towards the end of 1958 and at the beginning of 1959, difficulties developed between the parties which, as we shall point out, made the above cancellation clause extremely important. The accounts of these preliminary skirmishes vary. According to Hermsen, he heard from Ritchie constantly about the performance of the sales contract. According to Ritchie, he presented certain complaints to Hermsen and suggested that the latter make certain changes in the personnel of Sales. According to William Klein, attorney for Hermsen, the parties and their respective associates "had quite a number of talks at different times" about the agreement, especially after Ritchie indicated that he wanted to terminate it. There is evidence that Ritchie objected to the employment of one Ellis as the operating manager of Sales. Finally, at Ritchie's request, the parties held a meeting at Mr. Klein's office. The purpose of the meeting, as Klein put it, was to determine some way of terminating the July 15, 1958, sales agreement immediately without waiting the 60 days allegedly required by the cancellation clause of the contract.

This meeting took place on February 28, 1959, a Saturday. It was attended by Mr. and Mrs. Ritchie, one Hager, the vice-president of Pioneers, Mr. and Mrs. Hermsen, and Mr. Klein, their attorney. The testimony of the above persons as to what transpired at the meeting was in substantial conflict.

Hermsen called by the plaintiff under Code of Civil Procedure section 2055 (since he was president of the defendant Sales) testified as follows: Ritchie handed him a letter dated February 27, 1959, addressed to Hermsen and signed by Ritchie as president of Pioneers. This letter introduced in evidence by plaintiff stated in substance that Sales had failed to perform its agreement with Pioneers, that statements made by its representatives were embarrassing to Pioneers and that "[t]herefore, the National Sales Agreement, dated July 15, 1958, between Pioneers, Inc. and Edward N. Hermsen, at times referred to as 'Sales', is terminated as of midnight, Monday March 2, 1959, on the following grounds: 1. Failure to perform 2. For cause." Ritchie said that he wanted to cancel the contract and wanted nothing more to do with Sales because he was "fed up with" Ellis. Hermsen was unwilling to cancel the agreement because Sales had a 60-day cancellation clause in the contract, the business outlook was good and Sales was beginning to make money. In addition Hermsen told Ritchie that Sales had liabilities of approximately $40,000 including $14,000 owed to Cardinal. He

had been inactive in Sales because of a stroke suffered in September 1958 but offered to resume management of Sales and demote Ellis. Ritchie would not accept this solution but, according to Hermsen, offered the following proposition: "that if we would give up the contract and the operation of the company, that he would take over all assets and liabilities of the company"; that if Hermsen agreed to cancel the contract immediately, Ritchie would organize a new corporation in which Hermsen and Ritchie would each own 5 per cent of the capital stock. Hermsen testified that he "made the decision myself to go ahead and do this . . . and I put that understanding on paper, and sent a copy of it, sent the letter to Mr. Ritchie." However it is not disputed that the agreement claimed to have been reached by the parties was never reduced to writing.

Mr. Klein, attorney for Hermsen, called as a witness on behalf of plaintiff, testified that the object of the meeting was to arrive at a cancellation of the agreement immediately; that Ritchie wanted the contract terminated immediately; that he told Hermsen not to worry about the debts and that he would give the latter 5 per cent of the new venture for an immediate cancellation; that the liabilities and Cardinal's bill of $14,000 were mentioned; that "it was the general conversation" that Ritchie would take care of the debts; and that at the end of the meeting Hermsen agreed to the immediate cancellation of the National Sales Agreement.

Ritchie, also called by the plaintiff under Code of Civil Procedure section 2055, testified as follows concerning the events of the meeting of February 28: that the National Sales Agreement was actually cancelled on such occasion; that Ritchie said that he would make an attempt to salvage Sales by acting in an advisory capacity, "[p]rovided that the things that we accused them . . . had not occurred, and things were in good shape. . . . But in the meantime the franchise stood canceled. And if, as they told us, it was right, we would set up a new organization in which both parties would participate, and we would help all we could." William Hager, vice-president of Pioneers, testified to the same effect. Both Ritchie and Hager testified that the letter of February 27, 1959, was handed to Hermsen by Ritchie at the start of the meeting. Ritchie testified that during the course of the meeting there was no discussion of the 60-day cancellation clause "other than I told Mr. Hermsen that that did not enter into it, since we were canceling for cause."

Hager had no recollection of the clause being mentioned. Nor, according to Ritchie, was there any discussion of the bill owed to Cardinal.

On the following Monday, March 2, 1959, Mr. and Mrs. Hermsen and Mr. and Mrs. Ritchie met at Ritchie's office in Oakland. On the same day Ritchie took over the San Francisco office of Sales. On March 3, 1959, Mr. and Mrs. Hermsen as president and vice-president respectively of Sales sent the following letter to Ritchie addressed to the Oakland office of Pioneers: "Received your notice canceling my contract with you for Battery AD-X2. It is agreeable with me that the contract stand canceled immediately and we both are relieved of any liability thereunder." On March 5, 1959, Ritchie on behalf of Pioneers replied by letter to Hermsen stating that at the meeting of February 28, 1959, "we discussed salvaging your organization known as the Battery AD-X2 Sales Corporation"; that at such meeting Ritchie had said he "would help in any reasonable way to straighten things out"; that subsequent investigation had disclosed Sales was in "the embryo state and possibly not a valid corporate entity"; that the business transacted by Sales "has been handled in such a way both legally and ethically as to make my participation impossible in attempting to salvage your corporation"; and that "I do not want my name, the names of any of my principals or Pioneers, Inc., involved in any way with your corporation." On March 11, 1959, Hermsen sent a letter to Ritchie which in effect summarized Hermsen's version of the meetings of February 28 and March 2, and reaffirmed Hermsen's position that Pioneers would take over the operation of Sales, including its assets and liabilities.[3] On March 16, 1959, Ritchie replied by letter to Hermsen, denying the accuracy of the statements made by Hermsen and reaffirming Ritchie's position that the National Sales Agreement "was cancelled on March 2, 1959 as per our letter to you of February 27, 1959."

At any rate, Ritchie, who on March 2, 1959, had taken over the San Francisco office of Sales, continued operating it but for Pioneers' account. Pioneers paid the rent, took over the promotional literature for the battery additive found on the

[3]The letter also stated: "As condition of agreement you, Mrs. Ritchie or Mr. Hager were to be on the Board of Directors along with myself. In addition I was to receive five (5) per cent of sales along with yourself. I was also to be available in helping interest new investors and was to continue on in the capacity of President of Battery AD-X2 Sales Corporation until a new President was appointed or elected."

premises, sold franchises and quantitities of additive, and deposited in Pioneers' bank account all moneys received. Evidence was introduced of a conversation between Ritchie and Blackiston at the above offices sometime after March 2, 1959. The latter testified that on such occasion he told Ritchie that he, Blackiston, had placed the orders for the unpaid accounts of Sales; that his reputation was at stake; that it was his understanding that Ritchie was going to take care of the bills; and that Ritchie thereupon replied: "I will take care of them. As fast as I can draw the stuff out I will take care of them." At least two bills of other creditors of Sales were paid by Ritchie. Cardinal, having tried to collect its bill on several occasions, finally commenced the instant action on March 24, 1959. Ritchie and Pioneers were not named defendants in the original complaint, but were named as such in the first amended complaint filed October 5, 1959, and in the second amended complaint upon which the case was tried.

The jury brought in a verdict in favor of plaintiff and against both defendants for $15,022.82.[4]

The defendants contend (1) that there is insufficient evidence to sustain the verdict; (2) that the court erred in refusing to permit Mrs. Ritchie to read from her notes of the meeting of February 28, 1959; (3) that the court committed prejudicial error in refusing to allow the defendants to produce evidence of the cancellation of the National Sales Agreement for cause; (4) that the court erred in giving and refusing certain instructions; and (5) that the trial judge was guilty of prejudicial misconduct.

Our proper consideration of these contentions requires that we first set forth the basic issues of the controversy and the contrasting positions of the parties. The pivotal question in the case is the following: Did the defendants Pioneers and Ritchie on or about February 28, 1959, enter into an oral contract with Sales pursuant to which the defendants, among other things, agreed to pay Sales' indebtedness to the plaintiff? The answers to this question derive from the provi-

---

[4]As pointed out earlier, the indebtedness of Sales to Cardinal on the book account and on the account stated was $14,612.92. In addition Sales was liable for storage charges for printed matter for which it did not issue shipping instructions. These charges, claimed in the third count, amounted to $480, making a total of $15,092.92. No point is made of the difference of $70.10 between the last total and the verdict. It seems to be accounted for by a cash payment of $70.15 made when a small amount of literature was picked up.

sions of the National Sales Agreement theretofore in effect between Pioneers and Sales. It is the position of plaintiff here, as it was in the court below, that the defendants desired to cancel the written sales agreement; that such agreement, under its terms, could be cancelled only by mutual consent of the parties thereto or by either party upon 60 days' notice to the other; and that in consideration of the consent of Sales to an immediate cancellation and a waiver of its right to the 60-day notice, defendants promised to assume the liabilities of Sales, including the indebtedness owed plaintiff. It was and is the position of the defendants on the other hand, that on February 28, 1959, Pioneers terminated the sales agreement for cause, such termination to be effective March 2, 1959; that upon a termination for cause 60 days' notice was not required; that the oral third-party beneficiary contract claimed by plaintiff was never made; and that, even if defendants had promised to pay the liabilities of Sales, such promise was without consideration, inasmuch as a 60-day notice, not being required, was never waived. Eventually all arguments converge on one point of inquiry: Was an oral third-party beneficiary contract entered into?[5]

Section 1559 of the Civil Code provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." █ To recover as a third-party beneficiary, therefore, one must show that the contract in question was made expressly for his benefit. (*City & County of San Francisco* v. *Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, 120 [22 Cal. Rptr. 216]; *Shutes* v. *Cheney* (1954) 123 Cal.App.2d 256, 262 [266 P.2d 902].) It has been held that "expressly" means "in an express manner; in direct or unmistakable terms; explicitly; definitely; directly." (*Le Ballister* v. *Redwood Theatres, Inc.* (1934) 1 Cal.App.2d 447, 448 [36 P.2d 827]; *Watson* v. *Aced* (1957) 156 Cal.App.2d 87, 92 [319 P.2d 83].) █ While it is not necessary that the third

---

[5]It is noteworthy that the pretrial conference order stated that the issues in the case, among others, were: "(1) Was a contract expressly for the benefit of plaintiff made between Battery AD-X2 Sales Corporation, a corporation and Jess M. Ritchie, and/or Pioneers, Inc., a corporation? (2) Was there consideration for such contract? . . . (4) If any such promise or contract was made was the same the act of Jess M. Ritchie, individually, or did he in any such action act solely on behalf of Pioneers, Inc., a corporation? (5) Was there an acceptance of the contract for the benefit of the plaintiff assuming such contract was made? (6) Was there a withdrawal of any offer that may have been made before acceptance by the plaintiff? . . ."

party be specifically named as a beneficiary (*City & County of San Francisco* v. *Western Air Lines, Inc., supra*; *Spector* v. *National Pictures Corp.* (1962) 201 Cal.App.2d 217, 224 [20 Cal.Rptr. 307]) as the court stated in *Shutes* v. *Cheney, supra*, "an intent to make the obligation inure to the benefit of the third party must have been clearly manifested by the contracting parties." (P. 262.) ██ Thus, where upon the transfer to him of the assets of a business, one agrees to assume its outstanding liabilities, the preexisting business creditors are third-party beneficiaries. (*Anderson* v. *Calaveras Central Mining Corp.* (1936) 13 Cal.App.2d 338, 342-343 [57 P.2d 560]; *Dick* v. *Woolson* (1951) 106 Cal.App.2d 415, 419 [235 P.2d 119].) In any legal action brought to collect the debt, the creditor may join both the assuming party and the original debtor. (*Anderson* v. *Calaveras Central Mining Corp., supra*, at pp. 343-344; *Dick* v. *Woolson, supra*.)

██ Absent an estoppel, the parties to a third-party creditor beneficiary contract may rescind it at any time prior to the commencement of an action thereon by the beneficiary. (*Silveyra* v. *Harper* (1947) 82 Cal.App.2d 761, 766 [187 P.2d 83].) ██ Rescission of such contract thereupon deprives the beneficiary of all rights under the contract. (*Riley* v. *Riley* (1953) 118 Cal.App.2d 11, 15 [256 P.2d 1056].) ██ However, the third-party beneficiary contract cannot be rescinded or revoked, as long as the promisor retains or continues to receive the consideration from the original promisee. (*Pitzer* v. *Wedel* (1946) 73 Cal.App.2d 86, 90 [165 P.2d 971]; *Dick* v. *Woolson, supra*, 106 Cal.App.2d 415, 420; *Griffin* v. *Williamson* (1955) 137 Cal.App.2d 308, 317 [290 P.2d 361].)

██ An application of the above rules to the evidence herein, considered in the light of the familiar principles governing our review, would undoubtedly lead to the conclusion that there was sufficient substantial evidence to sustain the verdict at least as against the defendant Pioneers. It clearly appears from such evidence that Cardinal was a third-party creditor beneficiary. Not only did Cardinal fall within the general class of persons for whose benefit the alleged promise to pay was made but Cardinal was also specifically named and identified as a sizeable creditor of Sales. From such evidence, it also appears that Sales and Hermsen claimed the right to 60 days' notice of any cancellation of the National Sales Agreement and consented to an immediate

cancellation only upon Pioneers' promise to assume all of the liabilities of Sales. In such relinquishment of the right to 60 days' notice is found the requisite valuable consideration to support the third-party beneficiary contract. Nevertheless, although the evidence as thus considered on the present record might be deemed sufficient to support the verdict against Pioneers, we are of the opinion that the judgment must be reversed in respect to both defendants and a new trial be had because of prejudicial error in the exclusion of evidence relevant to the issue of the consideration for the alleged third-party contract and thus to the critical issue whether such contract was entered into in the first place.

It was the contention of the defendants in the court below that the National Sales Agreement was cancelled for cause.[6] As we have pointed out, the thrust of this argument was that Sales and Hermsen did not, as plaintiff alleged in its complaint, "forego the said sixty day cancellation notice" in exchange for the defendants' promise to pay the indebtedness owing plaintiff. According to defendants, no 60-day notice was in fact required.

Hermsen, as president of Sales, was called as the first witness by plaintiff under section 2055 of the Code of Civil Procedure.[7] We have already summarized his testimony during which he gave his version of the events leading up to the alleged third-party beneficiary contract entered into during the meeting of February 28, 1959. During the course of his cross-examination by plaintiff's counsel, plaintiff introduced in evidence the four letters exchanged between Hermsen and Ritchie between February 28, 1959, the day of the meeting and March 16, 1959. As we have set forth above, the first of the four letters, dated February 27, 1959, and admittedly delivered by Ritchie to Hermsen at the meeting on February 28, asserted on behalf of Pioneers that Sales had failed to perform in accordance with the National Sales Agreement, that oral, written and published statements had been and were embarrassing to Pioneers, and that "[t]herefore, the National Sales Agreement . . . is terminated as of midnight, Monday March 2, 1959, on the following grounds: (1) Fail-

[6]The pretrial conference order states: "It is the contention of the defendants that the revocation or cancellation of the franchise of Battery was 'for cause' within the meaning of the contract between Battery and Pioneers, Inc. and that there was no consideration for any promise to assume debts of Battery."

[7]We have already pointed out that Sales apparently waived any defense and was not involved in the trial. See footnote 1, ante.

ure to perform (2) For *cause.*'' (Italics added.) Hermsen, under examination by plaintiff's counsel, thereupon testified that despite the admitted receipt of the foregoing notice of termination, Hermsen and Sales insisted upon the right to 60 days' notice and finally accepted a proposition offered by Ritchie which was in effect a substitute for the termination contemplated by the letter and constituted the agreement upon which plaintiff now rests its cause. Yet it is apparent that all of this was but *Hermsen's* (and this plaintiff's) *version* of what occurred.

Upon examination by counsel for defendants,[8] Hermsen reaffirmed his previous testimony as to numerous and almost constant telephone calls from Ritchie, stating that ''mainly Mr. Ritchie wanted to run our business, it appeared'' and that the calls amounted to ''harassment.'' The following then occurred: ''MR. HANNON: Q. These conversations with you, isn't it true that Mr. Ritchie raised the question of the propriety of the advertising that was being put out by Sales? A. No. Q. Did he raise —— THE COURT: I wonder where we are going with this situation. What difference would it make? Let us assume that he was 100 percent wrong in everything that he did with this corporation, with the management of its affairs, advertising, and everything else, and that Ritchie was 100 percent right. Where are we in reference to the subject matter of this suit? The only question here is, did he agree to pay these bills, and what effect can the operation of the corporation, whether good, bad or otherwise have? None. MR. HANNON: Well, our position is that the agreement was cancelled for cause, your Honor. If that is an issue—we will stipulate to—— THE COURT: Stop right there. Assume for the sake of argument that it was cancelled for cause. Let us assume that. There is not any question for this jury to determine as to the corporation, either one of the corporations. The only question before this jury that they have to decide is this: Did Mr. Ritchie and the other defendants agree to pay the obligation of the Cardinal Press or not?''

Shortly thereafter, counsel for defendants asked Hermsen whether at the February 28 meeting Ritchie mentioned to

---

[8]Although denominated redirect examination in the record, Hermsen was actually under cross-examination by counsel for defendants. (Code Civ. Proc., § 2055; cf. *Goehring* v. *Rogers* (1924) 67 Cal.App. 253, 263 [227 P. 687]; *Gates* v. *Pendleton* (1925) 71 Cal.App. 752, 758 [236 P. 365]; *McCarthy* v. *Mobile Cranes, Inc.* (1962) 199 Cal.App.2d 500, 508-509 [18 Cal.Rptr. 750].)

him three incidents where Sales sold franchises, received the money therefor but failed to deliver the product. Without objection, the witness denied that the incidents had been mentioned. At this point counsel for plaintiff interposed an objection obviously too late.[9] After the ruling on this objection, the court said: "THE COURT: What difference would it make, counsel, if those things did take place? MR. HANNON: Well, your Honor, that is our theory of the case, or one of our theories of the case. THE COURT: What? MR. HANNON: That the contract was cancelled for cause. THE COURT: What would that have to do with it? MR. HANNON: That was one of the causes the contract was cancelled. THE COURT: This is the first time that it was brought to anybody else's attention. It was never mentioned in that letter. MR. HANNON: 'For cause.' It was mentioned in the letter. THE COURT: I know. All right."

Ritchie was the first witness called by the defendants. He was asked by his own counsel if, during the life of the National Sales Agreement, he had received complaints from distributors holding franchises from Sales. It is obvious that the purpose of these questions was to show "cause" for the cancellation of the agreement. Two questions were met with objections by the plaintiff which were sustained.[10] The following then occurred: "MR. HANNON: Q. Between July 15, 1958, and February 28, 1959, did you receive any complaints from any other franchise holders of Battery AD-X2 Sales Corporation concerning the advertising material that had been

[9]After the third question and answer, plaintiff's counsel stated that he "would like to object" but had not wanted to interrupt the examination. The court observed that the "objection should have come in when the first name was mentioned" but nevertheless said "[t]he objection will be sustained."

[10]"Q. Subsequent to July 15th of 1958 and prior to February 28, 1959, did you ever receive any complaints from any distributors who had franchises from Battery AD-X2 Sales Corporation? MR. KHOURIE: I will object to that question. It calls for a hearsay answer. THE COURT: The objection will be sustained. MR. HANNON: Q. Between February 28, 1959 —strike Between July 15th, 1958, and February 28, 1959, did you ever contact Mr. Edward Hermsen regarding complaints that you had received from franchise-holders of Battery AD-X2 Sales Corporation? MR. KHOURIE: I will object. THE COURT: Same ruling. MR. HANNON: Your Honor, might I have the last question read back? THE COURT: Read it back, please. (Record read.) MR. HANNON: And the objection, sir? THE COURT: It has been sustained. MR. HANNON: I am sorry, your Honor, I missed the basis of the objection; was it hearsay? MR. KHOURIE: There is no evidence that there was any complaints made. MR. HANNON: That is what I am asking. MR. KHOURIE: There is no evidence. It is a question that assumes something not in evidence. THE COURT: I think that the point is well taken, counsel."

put out by Battery AD-X2 Sales Corporation? MR. KHOURIE: I will object on the same ground, it calls for a hearsay answer. THE COURT: The objection will be sustained. I don't know where we are going. MR. HANNON: I believe the last —— THE COURT: As I understand this case, it is only whether or not an agreement was made by this witness as an individual or as president of the corporation to pay certain bills. If he did, and the jury, of course, has to determine those things, that is one thing. If he did not, that is another. I don't think that any complaints that may have been made by third parties have any bearing on this case in the slightest degree. I think we have allowed a lot of testimony to go in here which is certainly immaterial, irrelevant, and incompetent. And I don't think it makes a particle of difference whether they did or did not. MR. HANNON: Very briefly, your Honor, if I might, by way of offer of proof on this particular ground, or more particularly, the reason for the testimony is to show, as the Court is aware, that the agreement was canceled for cause. MR. KHOURIE: Your Honor, I will object to an offer of proof here. Counsel is going to —— THE COURT: I don't think there is anything before the Court, frankly.''

Immediately following the above colloquy, Ritchie in response to questions by his own counsel testified that he had a conversation with Mr. Klein, attorney for Hermsen, at the February 28 meeting. The following then occurred: ''MR. HANNON: Q. And who was present? A. There was present myself, and Mr. Klein. Q. And can you tell us, to the best of your memory, what was said by you and what was said by Mr. Klein at this meeting? A. I told Mr. Klein that I have having [sic] difficulty getting in contact with Mr. Hermsen, that there was considerable evidence that people were buying advertising material and that —— MR. KHOURIE: I will object to that, your Honor. THE COURT: Just what is the purpose of this? Will you please tell me that? MR. HANNON: Your Honor, to show that the National Sales Agreement was canceled for cause. THE COURT: There is not any doubt about it. It is admitted it was canceled on February 28th. Isn't that true? MR. HANNON: Yes, your Honor. THE COURT: All right. Now, then, what the reasons are for it, I don't care, and this jury is not interested. Let us assume Hermsen and his group were completely wrong in everything they ever did. The allegation of the complaint here is that this cancellation took place on February 28th with

the understanding and the promise of this witness to see that all the bills of the corporation were paid.''[11]

We need not concern ourselves with the adequacy of defendants' offer of proof since the court made it clear that it would exclude evidence tending to prove that the National Sales Agreement was cancelled for cause. Indeed, it appears to us that an offer of proof would have been futile. Under the circumstances presented in the instant record, the making of a formal offer of proof is not a prerequisite to our review of the propriety of the exclusion. (*Caminetti* v. *Pacific Mut. Life Ins. Co.* (1943) 23 Cal.2d 94, 100 [142 P.2d 74]; *Tomaier* v. *Tomaier* (1944) 23 Cal.2d 754, 760 [146 P.2d 905]; *Estate of Kearns* (1950) 36 Cal.2d 531, 537 [225 P.2d 218]; *DiMaria* v. *Mitchell* (1952) 112 Cal.App.2d 691, 697 [247 P.2d 60]; *Estate of Black* (1962) 211 Cal.App.2d 75, 90-91 [27 Cal.Rptr. 418].)

We must first determine whether, as claimed by defendants, Pioneers had the right to terminate the National Sales Agreement for cause free of any requirement of 60 days' notice. If such right existed, clearly the exclusion of evidence tending to show that Pioneers in fact terminated the agreement for cause was error. Defendants would be entitled to show that termination was effectuated according to their theory of case just as much as plaintiff would be entitled and in fact was permitted to show that termination was effectuated according to its theory of case. Evidence showing a termination ''for cause,'' if such right existed, would be relevant on the issue of consideration for, if Hermsen and Sales had no right to a 60-day notice of termination, plaintiff could not rely on their relinquishment of such right as constituting the consideration for defendants' promise to pay Sales' indebtedness to plaintiff. Indeed, plaintiff concedes in its brief that if Pioneers had the right to cancel for

---

[11]The court then continued: ''Now, if that is true, that is one thing. If it is not true, that is another. So, what difference would it make? If you will tell me that, as I said a moment ago, that is all water over the dam as far as this case is concerned. Assume there was every justification in the world, every one, without any reservation, for this corporation to cancel the agreement. Now, that is one thing. If the other corporation said, 'All right, if you want to cancel it, we will waive the 60-day provision. It is canceled with your promise which you made here to pay all of the outstanding bills of the corporation, and directly or particularly that bill of the Cardinal Press.' Now, that is the picture. Whether or not that is a fact, I am making no comment, of course. But that is all we are concerned with here.''

cause "then it would have been relevant to show that such unilateral cancellation was for 'cause.' "

As we have pointed out above, plaintiff takes the position that there is no right to terminate for cause. It argues that the words "for cause" refer to the words "for just cause" used in connection with the failure to meet monthly quotas; that, accordingly, the agreement "could only be cancelled by the parties upon their mutual consent and agreement or upon sixty days notice for failure to meet minimum requirements"; and that "[t]he trial judge obviously read it [the agreement] and correctly determined that defendant Pioneers, Inc., didn't have the right to cancel · unilaterally 'for cause'. . . ."

 No extrinsic evidence was offered by either party in aid of construction. The construction of the cancellation clause therefore presents a question of law and we are not bound by the trial court's interpretation of it. (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 430 [296 P.2d 801, 57 A.L.R.2d 914]; *Estate of Platt* (1942) 21 Cal.2d 343, 352 [131 P.2d 825].)

 The clause in question (paragraph 11) is in two parts. The first sentence provides that the failure of Sales to maintain quotas shall be considered "as just cause" for *Pioneers* to either revise the agreement or terminate it upon 60 days' written notice to Sales. It is clear that under this sentence a right to terminate is given *only* to Pioneers upon the occurrence of a specified event, namely failure to maintain quotas, and exercisable by giving written notice for a prescribed time. The second sentence however states that the agreement "may *also* be terminated by the *parties* by mutual consent or for *cause.*" (Italics added.) Clearly the word "also" imports additional methods of termination over those provided for in the first sentence. The second sentence as contrasted with the first provides for termination by the *parties* rather than by Pioneers alone. We find nothing in the second sentence indicating that it is a continuation or part of the first sentence or that, as plaintiff claims, the "cause" mentioned in the second is the same as the "just cause" referred to in the first. If this were so, it would not be necessary to provide for a termination for cause in the second sentence and such sentence could be well confined to a termination by mutual consent. We are of the opinion that the second sentence prescribes modes of terminating the contract which are in addition to and separate from those in the first sentence. Apart from termination by mutual con-

sent, we think that the second sentence means that *either* party can terminate the agreement for cause.

A contract may contain a valid provision giving one or either of the parties thereto an option to terminate it within a certain time or on specified conditions. (*Hernan* v. *Our Lady's Home* (1916) 32 Cal.App. 318, 319 [162 P. 901]; *Cline* v. *Smith* (1929) 96 Cal.App. 697, 699 [274 P. 761]; *Brawley* v. *Crosby Research Foundation, Inc.* (1946) 73 Cal. App.2d 103, 118 [166 P.2d 392]; *Wooton* v. *Dorr* (1948) 88 Cal.App.2d 781, 784 [199 P.2d 345]; 12 Cal.Jur.2d, Contracts, § 188; 12 Am.Jur., Contracts, § 434; 17 C.J.S., Contracts, § 399.) As stated in *Pease* v. *Brown* (1960) 186 Cal.App.2d 425, 432 [8 Cal.Rptr. 917] "a contract is not lacking in mutuality of obligation where a contingency, upon the ascertainment or happening of which a party has a right to terminate an agreement, is one over which such party has no means of control" citing *Vitagraph, Inc.* v. *Liberty Theatres Co.* (1925) 197 Cal. 694, 701 [242 P. 709]; 12 Cal. Jur.2d, Contracts, § 114; 1 Corbin, Contracts (1950), §§ 148, 149, 165; 1 Williston, Contracts (1957), §§ 103, 105, 119; 17 C.J.S., Contracts, § 100, p. 453. The rule of course is clear that a contract is lacking in mutuality where one party has the right to terminate it at any time at his pleasure. (1 Williston, *op. cit.*, § 105, p. 418; 12 Cal.Jur.2d, Contracts, § 114, p. 319; 17 C.J.S., Contracts, § 100.) However, as Williston states in his above treatise (1 Williston, *op cit.*, § 105, pp. 418-419) : "Since the courts, however, do not favor arbitrary cancellation clauses, the tendency is to interpret even a slight restriction on the exercise of the right of cancellation as constituting such legal detriment as will satisfy the requirement of sufficient consideration; for example, where the reservation of right to cancel is *for cause,* or by written notice, or after a definite period of notice, or upon the occurrence of some extrinsic event, or is based on some other objective standard." (Italics added.)

Thus it has been held that a provision for termination by one or either party after notice for a fixed period is enforceable and does not render the contract illusory. (*Cline* v. *Smith, supra; Brawley* v. *Crosby Research Foundation, Inc., supra; Phalanx Air Freight* v. *National Skyway Freight Corp.* (1951) 104 Cal.App.2d 771, 773 [232 P.2d 510].) Provisions have also been upheld which grant to one party the option to terminate the contract if dissatisfied with the performance by

the other. (*Wooton* v. *Dorr, supra*, 88 Cal.App.2d 781, 784; *Van Demark* v. *California Home Extension Assn.* (1919) 43 Cal.App. 685, 687-688 [185 P. 886]; see *Hernan* v. *Our Lady's Home, supra*, 32 Cal.App. 318, 319; see generally 17 C.J.S., Contracts, § 399, p. 890.) The last authority states that "[s]uch a provision is analogous to a provision for performance by one party to the satisfaction of the other, . . . The option to terminate the contract can only be exercised in good faith."

Comparable to the foregoing are those provisions which, like that now engaging our attention, grant to one or either of the parties to the contract an option to terminate "for cause," "for just cause" or "for good cause." At the outset we observe that, as used in a variety of contexts, these phrases have been found to be difficult to define with precision and to be largely relative in their connotation, depending upon the particular circumstances of each case. (See for example: *Ex parte Bull* (1871) 42 Cal. 196, 199; *Bartlett Hayward Co.* v. *Industrial Acc. Com.* (1928) 203 Cal. 522, 532 [265 P. 195]; *Zurich G. A. & L. Ins. Co., Ltd.* v. *Kinsler* (1938) 12 Cal.2d 98, 101-102 [81 P.2d 913]; *California Portland Cement Co.* v. *California Unemp. Ins. Appeals Board* (1960) 178 Cal.App.2d 263, 272-273 [3 Cal.Rptr. 37].) Speaking of "good cause" as that term is used in the Unemployment Insurance Act, the court in the *California Portland Cement* case quoted from *Bliley Electric Co.* v. *Unemployment Comp. Board of Review*, 158 Pa. Super. 548 [45 A.2d 898] as follows: "Of course, 'good cause' and 'personal reasons' are flexible phrases, capable of contraction and expansion, and by construction, all meaning can be compressed out of them or they may be expanded to cover almost any meaning. Reducing them to a fixed, definite and rigid standard, if desirable, is necessarily difficult, if not impossible. *However, in whatever context they appear, they connote, as minimum requirements, real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith.*" (Italics added.) It has been said that "just cause" as used in connection with the removal of a corporate officer implies the existence of facts justifying the action taken and something more than a mere wish. (*Good* v. *Common Council* (1907) 5 Cal.App. 265, 270 [90 P. 44].) ▪ Webster's Third New International Dic-

tionary (1963 ed.) gives, among others, the following definitions for the noun "cause": "a reason or motive for an action or condition . . . a good or adequate reason: a sufficient activating factor."

We apprehend at the nucleus of this concept of "cause" or "good cause" the essential ingredients of reasonable grounds and good faith. Thus in *Quick* v. *Southern Churchman Co.* (1938) 171 Va. 403 [199 S.E. 489] where the agreement under consideration provided that it could be terminated "for just cause by either party hereto upon thirty days' written notice" the court said: "It is obvious that 'just cause' or 'good cause' is not synonymous with legal cause. The right to cancel for a legal cause exists independently of the contract. One can terminate any contract for legal cause. No extension of time is required after a notice therefor. On the other hand, 'just cause' or 'good cause' cannot be reduced to a legal certainty. To be effective, it must relate to the circumstances relied on. The grounds upon which it is based must be reasonable, and there should not be an abuse of the conferred right. It must be a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. It limits the party to the exercise of good faith, based upon just and fair grounds as distinguished from an arbitrary power. To this extent, it includes causes outside of legal causes.

"The clause in question is not often found in contracts coming before the courts. In the few cases cited to us, the decisions hold that such a clause permits cancellation upon other than legal grounds, when the power is exercised in good faith upon fair and reasonable grounds. *May* v. *May*, 167 U.S. 310 [17 S.Ct. 824, 42 L.Ed. 179]; *Cummer* v. *Butts*, 40 Mich. 322 [29 Am.Rep. 530]; *Starin* v. *U.S.*, 31 Ct.Cl. 65." (Pp. 494-495 [199 S.E.].) The same rationale was employed in *Dubois* v. *Gentry* (1945) 182 Tenn. 103 [184 S.W.2d 369] where a lessee was given a right to terminate upon notice "for any reason" other than his wilful act or damage or destruction of the premises: "We cannot say that it could be terminated for a trivial reason, since in many circumstances such an excuse might amount to nothing more than a wilful act. If, however, the reason for its termination is founded in truth and fair dealing, then it is sufficient to justify the lessee in terminating his contract. Such a reason falls within the express provisions of the contract now before us. The words 'if for any reason', etc., as incorporated in the con-

tract, should be construed to mean 'any good reason or just reason'." (P. 371 [184 S.W.2d].)[12]

In *Cummer* v. *Butts* (1879) 40 Mich. 322 [29 Am.Rep. 530] which is cited both in *Quick* v. *Southern Churchman Co., supra,* and *Zurich G. A. & L. Ins. Co., Ltd.* v. *Kinsler, supra,* the agreement in question provided for revocation by either party for "good cause" upon sixty days' notice. While the court there was of the opinion that "the phrase 'good cause' . . . has no such distinct sense as to furnish a common and intelligible criterion for the parties," it held that "[t]he passage in question being ineffective on account of its radical uncertainty, there was nothing to detract from the exercise of the right of revocation as it actually occurred, provided the plaintiffs in error acted in good faith." (P. 325.)

We are of the opinion that a right to terminate "for cause" or "for good cause" means upon reasonable grounds assigned in good faith. (*Quick* v. *Southern Churchman Co., supra,* 199 S.E. 489; see generally 12 Am.Jur., Contracts, § 434.) Such a right since it "is not wholly controlled by the will of the promisor himself" (1 Corbin, *op.cit.,* § 165) and since it does not permit the one invoking it "to withdraw from the agreement at . . . [his] own unrestricted pleasure" (*Pease* v. *Brown, supra,* 186 Cal.App.2d 425, 432) is not invalid as an arbitrary and absolute power to cancel.[13]

Since Pioneers had the right under the National Sales Agreement to terminate it for cause, it was clearly error for the trial court to exclude evidence tending to prove such mode of termination. This was a material issue in the case as is pointed up by Pioneers' letter of February 27 which notified Sales that the agreement was terminated for cause. The defendants were entitled to have received in evidence and considered by the jury all competent, relevant and

---

[12]See *Ingrassia* v. *Bailey* (1959) 172 Cal.App.2d 117, 124-125 [341 P.2d 370] where the lease provided that it "shall continue from month to month but may be terminated by either party at any time for cause."

[13]Our conclusion that the agreement gave Pioneers the right to terminate it for cause does not per se exclude plaintiff's right to contend that Hermsen and Sales relinquished their claimed right to 60 days' notice in consideration of defendant's alleged promise to assume the liabilities. The relinquishment of such doubtful and disputed right or claim, if believed in good faith to exist, and not wholly void, would constitute adequate consideration for the third-party contract. (*Booth* v. *Bond* (1942) 56 Cal.App.2d 153, 157 [132 P.2d 520]; *Silver* v. *Shemanski* (1949) 89 Cal.App.2d 520, 531 [201 P.2d 418]; *Blonder* v. *Gentile* (1957) 149 Cal.App.2d 869, 875 [309 P.2d 147]; cf. Civ. Code, § 1605.)

material evidence on any material issue. (*Ponce* v. *Marr* (1956) 47 Cal.2d 159, 163 [301 P.2d 837]; *Mashbir* v. *Mashbir* (1938) 29 Cal.App.2d 733, 735 [85 P.2d 482]; *Schubkegel* v. *Gordino* (1943) 56 Cal.App.2d 667, 677 [133 P.2d 475]; *Bole* v. *Bole* (1946) 76 Cal.App.2d 344, 345-346 [172 P.2d 936]; *Foster* v. *Keating* (1953) 120 Cal.App.2d 435, 451 [261 P.2d 529].) ▆▆▆ The exclusion of the evidence in question was clearly prejudicial to the defendants' case. It was particularly prejudicial to the defendant Ritchie who in his individual capacity was not a party to the agreement and who was sought to be held liable on the third-party contract according to the plaintiff's version of the case.

The foregoing error was aggravated by the court's instructions to the jury dealing with the respective contentions of the parties. Defendants proposed an instruction stating in substance such respective positions in much the same manner set forth herein. The court modified this instruction by deleting certain paragraphs. As a result, while the jury were told that Pioneers contended that it never promised to pay the debts of Sales and that even if it did, there was no consideration for such promise, the following contentions of Pioneers were withdrawn from the jury: that the National Sales Agreement was terminated for causes other than failure to meet quotas; that therefore there was no requirement of 60 days' notice; that the agreement was terminated by mutual consent and therefore no 60 days' notice was necessary; and that if there was no requirement for 60 days' notice, there was no consideration for any claimed promise to pay the debts of Sales. The court in addition gave plaintiff's proposed instruction 23 as modified,[14] which in effect told the jury that if they found that Sales did in fact cancel the National Sales Agreement, including the 60-day provision, such promise and consent to cancel would constitute consideration supporting the third-party contract. These instructions in effect presented to the jury only the plaintiff's theory of case and told them that the agreement could only be cancelled by 60 days' notice or mutual consent. Defend-

---

[14]This instruction as given read as follows: "In this case, I instruct you that if you did find that the defendant Battery AD-X2 Sales Corporation did in fact agree to cancel the franchise agreement, including the 60-day provision, that such promise and consent to cancel said agreement was a good and valuable consideration, such as would support a promise by either defendant Pioneers, Inc. or defendant Ritchie to pay the plaintiff, if you find such a promise was in fact made."

ants' defense that the agreement was cancelled for cause was removed from their consideration.

Finally, since a new trial must be had, we consider briefly certain errors urged by the defendants in connection with other instructions. ■■ The court gave plaintiff's proposed instruction 24 setting forth what must be shown to recover on a third-party beneficiary contract. While apparently not objecting to the correctness of this instruction, defendants urge that it was incomplete and misleading because it was not accompanied by an instruction that any doubt as to the intent to benefit the third party must be resolved against the existence of such intent. Defendants' proposed instruction 9, which was refused, contained a statement to that effect. We find the instruction to contain a correct statement of the law in accordance with the principles hereinabove set forth by us. The court gave an instruction to the effect that plaintiff had the burden of proving the third-party contract and that it was supported by consideration. Since the matter was thus covered by other instructions, there was no error in the court's refusal to give defendants' instruction (*Nippold* v. *Romero* (1956) 145 Cal.App. 2d 235, 241 [302 P.2d 367]).

Defendants also complain of the court's refusal to give certain proposed instructions dealing with the rescission of the third-party beneficiary contract. These were apparently designed to present defendants' theory that even if there were a promise on defendants' part to pay the liabilities of Sales, such promise was rescinded "both bilaterally and unilaterally" before it was accepted by Cardinal by the commencement of the instant action. This was consistent with the issues designated in the pretrial conference order (see fn. 5, *ante*). The essence of defendants' objection is that the court, by modifying defendants' instruction 3, instructed the jury on rules applicable to *bilateral* rescission of a third-party beneficiary contract but deleted from the instruction those portions referring to a *unilateral* rescission of such a contract.[15] At the same time defendants assert that the court

---

[15]The following portions of the instruction were deleted: "However, such rescission does not necessarily require the mutual consent of the two parties to the contract. Such a third-party beneficiary contract can be rescinded by the unilateral act of one of the parties to the contract. However, if one of the parties alone desires to rescind the contract, he must return any consideration he might have received for entering into the contract. . . .

"If you should find that such contract was not rescinded by the mutual consent of all of the defendants, then you must determine whether or not such contract was rescinded by the unilateral act of any

erred in instructing the jury as requested by plaintiff that a third-party beneficiary contract may be rescinded *only* with the consent of both parties.[16]

As we have pointed out earlier in this opinion, the parties to a third-party creditor beneficiary contract may rescind it at any time prior to the commencement of an action by the beneficiary. (*Silveyra* v. *Harper, supra,* 82 Cal.App.2d 761, 766 [187 P.2d 83]; Civ. Code, § 1559; Rest., Contracts, § 143.) Since the alleged contract before us is a *creditor* beneficiary contract and not a *donee* beneficiary contract, we need not discuss the principles of rescission applicable to the latter category. (See Rest., Contracts, § 142; 1 Witkin, Summary Cal. Law, pp. 237, 241-242.) ■ The principles governing rescission of third-party beneficiary contracts are those applicable to the rescission of contracts generally. ■ Thus an executory bilateral contract can be rescinded by mutual consent of the parties (former Civ. Code, § 1689, subd. 5) or unilaterally by one of the parties upon proper grounds as, for example, *inter alia,* for fraud, mistake or failure of consideration. (Former Civ. Code, § 1689; see generally 1 Witkin, *op. cit.,* pp. 326-329.)[17] We deem it unnecessary for our present purposes to set forth these rules in detail. Suffice it to say that they apply to third-party creditor beneficiary contracts. ■ Civil code section 1559 in providing that a third-party beneficiary contract may be enforced "before the parties thereto rescind it" does not state nor in our view even imply that such rescission can only be by mutual con-

one of the defendants. However, to find that one of the defendants alone rescinded the contract, you must find that he returned any consideration which he might have received for entering into the contract.

"The plaintiff denies that the oral contract entered into for his benefit between the defendant, BATTERY AD-X2 SALES CORPORATION, and defendants, JESS M. RITCHIE and PIONEERS, INC., was ever rescinded, either by the mutual consent of all of such defendants, or by the unilateral act of the defendants, JESS M. RITCHIE and PIONEERS, INC.''

[16]This instruction (plaintiff's 17) read as follows: "After a contract to pay a third person, such as the plaintiff, has been made, neither party to such contract can rescind or cancel it merely by giving notice to the other party of his intention to do so, without the agreement or consent of the other. It may be rescinded or cancelled *only with the consent of both parties.*

"By both parties in this case, I mean the contracting parties, that is to say, defendant Battery AD-X2 Sales Corporation on the one part and defendant Pioneers, Inc. or defendant Ritchie on the other." (Italics added.)

[17]Section 1689, Civ. Code, and other code sections relating to rescission were revised in 1961. See discussion in reference thereto in 36 State Bar Journal, pp. 677-679.

150

sent. We have not been referred to by respondent nor have we found any authority so holding. In our view ·the phrase contained in Civil Code section 1559 "before the parties thereto rescind it" means all manner of rescission provided by law, that is rescission by both parties or unilaterally by one as the circumstances may warrant. (See for example *Pyle* v. *Benjamin* (1929) 102 Cal.App. 691, 695 [283 P. 372] showing the relationship between Civil Code section 1559 and Civil Code section 1689.) The statement in the instruction proposed by plaintiff and given by the court that the third-party contract here involved could be rescinded only with the consent of *both parties* was an incorrect statement of the law.

 Conversely, the deleted portions of defendants' proposed instruction 3 are a correct statement of the law to the extent that they declare that a third-party beneficiary contract does not necessarily have to be rescinded by mutual consent but may be rescinded unilaterally.[18] However with this exception we find the instruction generally inadequate since it fails to set forth the law specifically applicable to the unilateral rescission claimed under the evidence as for example, among other things, the grounds of such rescission, the giving of notice or excuse for failure to give notice, the timeliness of the notice or the excuses for delay if not timely. We also observe that the proposed instruction states that the party desiring to rescind "must return any consideration he might have received." This portion of the instruction, while probably not favorable to the offering party, is not a complete and accurate statement of ·the. procedure governing rescission (former Civ. Code, § 1691) or of the principles relieving the rescinding party from the obligation to restore everything of value received under the contract. (See generally 12 Cal.Jur.2d, Contracts, ·p. 415, .et seq.) Such rules relevant to unilateral rescission as· are applicable in the light .of the evidence received .on .retrial should be incorporated in any instruction offered on ·this subject.

Since a new trial must be had, there is no need to discuss defendants' remaining contentions on appeal.

The judgment is reversed.

Bray, P. J., and Molinari, J., concurred.

---

[18]Defendants supported their proposed instruction with .the .citation of *Dick* v. *Woolson, supra,* 106 Cal.App.2d 415, 419 and *Griffin v. Williamson, supra,* 137 Cal.App.2d 308, 317,